United States Court of Appeals,

Eleventh Circuit.

No. 94-6301.

Greg BARNETTE, Plaintiff-Appellee,

Mike Mosko, Consolidated Plaintiff-Appellee,

v.

Emory FOLMAR;  Roger Owens, Defendants-Appellants,

Larry Armstead, Defendant,

John Wilson, Defendant-Appellant,

Tom Azar;  Wyatt Gant;  City of Montgomery, Defendants.

Sept. 15, 1995.

Appeal from the United States District Court for the Middle
District of Alabama. (Nos. CV-90-C-959-N and CV-91-168-N), John L.
Carroll, Magistrate Judge.

Before KRAVITCH, ANDERSON and EDMONDSON, Circuit Judges.

PER CURIAM:

This case comes to us on defendants' appeal of the denial of

summary judgment based on qualified immunity.[1]

Plaintiffs Barnette and Mosko were police officers in

Montgomery, Alabama in 1989-90.  Captain Armstead was in charge of

the Return Our Turf (ROT) Team of the Narcotics and Intelligence

Bureau.  Between December 1989 and February 1990, Captain Armstead

received between 25 and 30 anonymous phone calls stating that some

ROT members would stop people, find drugs and money, and take the

---

[1]The City of Montgomery also appeals the magistrate judge's
denial of its motion for summary judgment on Barnette and Mosko's
liberty interest claim, a denial not about qualified immunity,
but about the merits.  We lack pendent party jurisdiction of the
kind needed to consider denial of Montgomery's motion for summary
judgment. *See Swint v. Chambers County Comm'n,* --- U.S. ----,
115 S.Ct. 1203, 131 L.Ed.2d 60 (1995).

money without arresting the people.  Officers Marty Wooten and Mike Mosko were specifically identified by their nicknames ("Patch-Eye" and "Old Dude," respectively), and other officers were physically described.

Armstead went out with the ROT team to execute a search warrant.  Armstead saw jewelry in plain view in one room.  He saw Barnette and Wooten go into the room;  and, after they left, the jewelry was gone.  A large amount of cash was also found at the residence;  but when Armstead checked the report the next day, the amount reported was different from the amount he saw during the execution of the search.

After speaking with Sergeant Caffey and Lt. Brown, both of whom mentioned rumors of dishonest policemen, Armstead discussed with his supervisor, Major Roger Owens, setting up a sting operation.  Armstead told Sergeant Tom Azar that Barnette and Wooten were subjects of the sting.  As part of the sting operation, $2,300 and 9 grams of cocaine were planted in an apartment.  An undercover police department trainee posed as the resident of the apartment.  Detective Lay and Corporal Jones arrived first and arrested the undercover operative.  While Lay stayed with the arrested undercover operative, Jones went inside the apartment.  Jones was inside the apartment for about 25 seconds.  Lay and Jones were in front of the apartment when the ROT Team arrived.  The ROT members stayed in the apartment about 2 minutes.  After the ROT Team left, Armstead and Azar went inside the apartment and found that the money and drugs were gone.

Back at police headquarters, Azar was instructed to stay with

the ROT Team members; but they all left his sight at one time or another to go to the bathroom. During an interview, Officer Bertarelli, one of the ROT Team members, told Captain Gantt that Wooten had given to Officer Bertarelli an envelope with money from inside the apartment. Bertarelli got $560, and he said that Wooten divided the rest of the money and put it into three other envelopes. The only money initially found was on Bertarelli. More money was later found in the sewer line from the building; and still later, more was found in the sewer line down the street.

Officers Mosko and Barnette maintained their innocence throughout interviews following the sting. Major Owens called Chief John Wilson and told him about the results of the sting. A lawyer, Roianne Frith, was called in to represent Jones, Wooten, Mosko and Barnette. Chief Wilson notified Mayor Folmar and asked the Mayor if it would be acceptable if the officers resigned and returned the money instead of facing formal charges and possible termination. The Mayor agreed, and this offer was communicated to the four officers through Frith. As part of the agreement, Chief Wilson told Frith that the names of the four officers would not be released. All four officers agreed to and did resign. Chief Wilson then held a press conference at which he named the four officers and called them "dirty cops."

Barnette and Mosko filed suit against Mayor Folmar, Chief Wilson, Major Owens, Captain Armstead, Captain Gantt and Sergeant Azar. In their complaint, Barnette and Mosko allege that their right to due process was violated when they were constructively discharged without a hearing and that they were deprived of a

liberty interest without due process when Chief Wilson called them "dirty cops" at the press conference.

Defendants plead the defense of qualified immunity for the claims against them in their individual capacities. Defendants Armstead, Gantt and Azar have been dismissed from the case, leaving Folmar, Wilson and Owens still in the case. The district court denied summary judgment based on qualified immunity to all defendants on plaintiffs' constructive discharge claim and granted summary judgment based on qualified immunity to all the individual defendants, except Chief Wilson, on the liberty interest claim.

The review of a denial of summary judgment based on a claim of qualified immunity is *de novo. James v. Douglas,* 941 F.2d 1539, 1542 (11th Cir.1991). The individual defendants have shown that they were all acting within the scope of their discretionary authority when they offered to Barnette and Mosko the option of resigning from the police force instead of being fired. The burden now shifts back to Barnette and Mosko to show that the law on constructive discharge, as it would apply to these circumstances, was clearly established and that defendants violated it. *See Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988).

Barnette and Mosko have not met their burden. They have not shown that all reasonable officials in the positions of Mayor Folmar, Chief Wilson and Major Owens would have thought that offering the option of resignation, instead of being brought up on formal charges, would amount to a constructive discharge that would violate Barnette and Mosko's rights to due process. In the circumstances, giving Barnette and Mosko the opportunity to resign

could have reasonably seemed, in the light of pre-existing law from other circuits and the lack of law in this circuit, to be no discharge at all. *See Parker v. Board of Regents of Tulsa Junior College,* 981 F.2d 1159 (10th Cir.1992); *Bishop v. Tice,* 704 F.2d 417 (8th Cir.1983). Defendants were entitled to qualified immunity on the due process/constructive discharge claim.

Chief Wilson is the only individual defendant whose qualified immunity was denied on plaintiffs' liberty interest claim. One element of plaintiffs' claim against Chief Wilson must be that the Chief's "dirty cops" statement was made in connection with their discharge from government employment. *See, e.g., Andreu v. Sapp,* 919 F.2d 637, 644 (11th Cir.1990). In this case, plaintiffs had already resigned their employment *before* Chief Wilson said stigmatizing things about them. No case binding in this circuit clearly established as a legal matter that plaintiffs' resignations were, in these circumstances, discharges. And, no case has been cited to us that clearly established (in 1990 before Wilson spoke publicly) that a violation-of-liberty-interest claim would arise where the employee *resigned* his employment instead of standing on his right to a hearing on formal charges and where the employer's stigmatizing statements were made *after* the employee had resigned. Considering the lack of precedent on point, Chief Wilson is entitled to immunity in his individual capacity on plaintiffs' liberty interest claim. *See generally Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1150 (11th Cir.1994) ("For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel ..., the conclusion for every like-situated,

reasonable government agent that what defendant is doing violates federal law *in the circumstances*.") (emphasis in original).

On plaintiffs' due process claim, the district court's denial of summary judgment based on qualified immunity for Folmar, Owens and Wilson is reversed. On plaintiffs' liberty interest claim, the district court's denial of summary judgment based on qualified immunity for Wilson is reversed. The case is remanded for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.