John Melvin HUGHES, Plaintiff,

v.

The ALABAMA DEPARTMENT OF PUBLIC SAFETY, et al., Defendants.

No. Civ.A. 97–A–372–N.

United States District Court, M.D. Alabama, Northern Division.

Feb. 23, 1998.

Alvin T. Prestwood, Daniel L. Feinstein, Owen, Dean, Hartzog, Volz, Prestwood, Hanan & Sizemore, Montgomery, AL, for John Melvin Hughes.

Robert E. Morrow, Dept. of Public Safety, Montgomery, AL, Jack M. Curtis, Office of the Atty. Gen., Montgomery, AL, for Alabama Dept. of Public Safety.

William H. Pryor, Jr., Atty. Gen., Robert M. Weinberg, Jack M. Curtis, Montgomery, AL, William Prendergast, Montgomery, AL, for Halycon V. Ballard, in her official capacity as State Personnel Director, defendant.

Robert E. Morrow, Jack M. Curtis, Scott A. Rogers, Huntsville, AL, for Gene Shannon, individually and in his official capacity as an Agent in the Alabama Department of Public Safety, and Pat Price, individually and in his official capacity as an Agent in the Alabama Department of Public Safety, defendants.

### MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion for Summary Judgment filed by L.N. Hagan, John Cloud, Tyrone Anderson, Gene Shannon, and Pat Price, individually and in their official capacities ("the state officials") and the Alabama Department of Public Safety ("Department") (collectively "the Defendants").

The Plaintiff, John M. Hughes ("Hughes"), originally filed a Complaint in this case on February 13, 1997, in the Circuit Court of Montgomery County, Alabama. The case was subsequently removed to this federal court.

On May 28, 1997, the court granted in part a Motion to Dismiss filed by Halycon Ballard, the Personnel Director for the State of Alabama. The case is proceeding against Halycon Ballard in her official capacity for expungement of records. On June 10, 1997, the court also granted in part, and denied in part, a Motion to Dismiss filed by the Department and the Department employees who are named as defendants in this case. As a result of the June 10, 1997 Order, the case is proceeding against the Department on Hughes' Title VII claim, and against the state officials in their official capacities, to the extent that prospective injunctive or declaratory relief is requested, and the state officials in their individual capacities, on the § 1983 claims for deprivation of a property interest without due process of law, deprivation of a liberty interest without due process of law, constructive discharge without due process of law, violation of the Equal Protection clause, and for violation of § 1981. In the court's order, Hughes was also given seven days in which to amend the Complaint so as to state claims against the Defendants under the Alabama Constitution. On June 19, 1997, Hughes filed an Amended Complaint adding three additional counts: (1) violation of procedural due process under the Alabama Constitution, (2) violation of freedom of speech under the Alabama Constitution, (3) violation of equal protection of laws under the Alabama Constitution.[1]

On November 20, 1997, the Defendants moved for summary judgment.[2] On Decem-

---

1. The Defendants have stated in brief that they move to strike the Plaintiff's Amended Complaint as untimely filed. However, it appears that a weekend intervening in the seven day period makes filing on June 19 timely. See Fed.R.Civ. Pro. 6(a), Therefore, the Defendants' Request is DENIED.

2. The Motion and accompanying brief do not indicate that summary judgment is sought on behalf of Halycon Ballard.

ber 29, 1997, Hughes filed a Memorandum Brief in Opposition to the Defendants' Motion for Summary Judgment. The Defendants filed a Response to the Plaintiff's Opposition on January 14, 1998, to which Hughes Replied on January 14, 1998.

## II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*

Believing all evidence of the Plaintiff and drawing all inferences in his favor, the submissions of the parties establish the following facts:

Hughes began working as a State Trooper with the Department of Public Safety in May of 1974. In July of 1985, he was assigned to the Alabama Bureau of Investigation and he served as a Corporal in the Huntsville office. Hughes was promoted to Sergeant on a probationary basis, effective March 30, 1996.

Hughes' probationary period performance was first evaluated by his supervisor, R.J. Wilemon, on June 10, 1996. According to the Complaint, Hughes was ranked on the upper side of a scale denominated as "exceeds standards."

In August of 1996, Captain Tyrone Anderson ("Anderson") was asked by the head of the Alabama Bureau of Investigation, Major Mike Sullivan ("Sullivan"), to go to Decatur, Alabama to become part of an ongoing investigation of Hughes. Anderson met with various Department employees, including Hughes.

After his meetings, Anderson discussed the situation involving Hughes with Major John Cloud ("Cloud"), then head of the Alabama Bureau of Investigation Division of the Alabama Department of Public Safety. Cloud subsequently wrote to Hughes and placed him on mandatory annual leave for a period of up to 10 days due to allegations of professional misconduct. Cloud recommended that Hughes be returned to permanent status as a Corporal and be transferred from the Alabama Bureau of Investigation ("ABI"). These recommendations were approved by Colonel L.N. Hagan ("Hagan"), and Hughes was transferred to Dothan as a Hearing Officer in the Driver License Division.

## IV. *DISCUSSION*

### A. Racial Discrimination Claims

Hughes contends that the Department of Public Safety took employment action against him on the basis of race. Hughes brought claims against the Department of Public Safety for race discrimination under 42 U.S.C. § 2000e ("Title VII"), against individual defendants in their official and individual capacities under 42 U.S.C. § 1981 for race discrimination, and 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the United States Constitution. All three claims, premised on the same facts, require evidence of intentional discrimination on the basis of race. Consequently, the framework traditionally applied to claims of intentional discrimination under Title VII may also be applied to Hughes' § 1981 claim for racial discrimination and § 1983 claim for violation of the Equal Protection Clause. *See Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946 (11th Cir.1991) (Title VII framework applies to § 1981 claims); *Lee v. Conecuh County Board of Education*, 634 F.2d 959 (5th Cir.1981) [3] (Title VII framework applies to § 1983 claim).

Where, as here, the plaintiff seeks to prove intentional discrimination by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. *Id.*, 411 U.S. at 802. After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff then has the opportunity to come forward with evidence, including the previously produced evidence establish-ing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256; *Combs*, 106 F.3d at 1534.

In moving for summary judgment, the Defendants have argued that there was a legitimate non-discriminatory reason for denying Hughes his promotion, returning him to the rank of corporal, and transferring him to Dothan.[4] According to the Defendants, Hughes was denied a promotion and transferred from the ABI Division because Anderson found that Hughes was deceitful about allegations of misconduct and had engaged in irresponsible behavior. The Defendants submit evidence along with Anderson's affidavit which they contend reflect a pattern and practice on the part of Hughes of lying to and about other ABI agents.

In response, Hughes has argued that the Department's articulated reason is pretextual on several grounds. A plaintiff may create a question of fact as to pretext by providing evidence either that the employer's articulated reason is unworthy of belief, or that discrimination was the true motivation.

### a. Evidence that Reason is Unworthy of Belief

 Hughes argues that Defendant Anderson based his investigation of Hughes in part on the statements of Department employees Defendant Sergeant Nall and Defendant Shannon, and that a reasonable jury could conclude that Nall and Shannon made

---

**3.** The Eleventh Circuit adopted as binding precedent all former Fifth Circuit cases decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

**4.** The Plaintiff has stated that he is an African–American and therefore in a protected class, that he was demoted and transferred, and that his duties were taken over by a white employee. Therefore, given that the Defendants have not expressly challenged the elements of Hughes' prima facie case, other than to challenge his ability to prove intentional discrimination, the court finds that he has established a prima facie case for purposes of this motion.

comments which were not true. As Hughes explains it, Nall and Shannon had a motive to be untruthful in making statements during Anderson's investigation. For instance, Hughes provides evidence that Shannon never wanted Hughes to be his supervisor and that Shannon thought that Hughes lacked intelligence, integrity, and emotional stability. Eldon Shannon Deposition, page 32.

While it may be that Hughes has produced evidence which could undermine the veracity of the information given by Nall or Shannon to Anderson, that is not enough to establish that the Department's articulated reason is unworthy of credence. The essential question is whether Hughes has provided evidence which demonstrates "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997).

Hughes' contention is not unlike the argument advanced by a plaintiff in a case decided by the Eleventh Circuit under an analogous claim under the Age Discrimination in Employment Act. *See Elrod v. Sears, Roebuck and Company,* 939 F.2d 1466 (11th Cir.1991). In *Elrod,* an employee was fired and the employer articulated the nondiscriminatory reason that he engaged in harassment. The plaintiff argued that the persons interviewed in the investigation lied. The Eleventh Circuit explained that the court could assume that the complaining employees who were interviewed were lying through their teeth because the court's inquiry was limited to whether the employer believed that the plaintiff was guilty of harassment and that this belief was the reason behind the plaintiff's discharge. *Id.* at 1470. "For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that

the defendant in good faith believed plaintiff's performance to be unsatisfactory...." *Id.* (quotation and citation omitted); *see also Smith v. Papp Clinic,* 808 F.2d 1449, 1452, 1453 (11th Cir.1987) (stating that firing a plaintiff under an honest though mistaken belief that the employee violated a company policy did not violate § 1981).

Hughes has also provided several pages of deposition testimony in which Anderson was asked about specific documents relating to his investigation of Hughes.[5] In response to some of the questions about these documents Anderson answered that he did not recall the document or did not recall that the document was a part of his report. Anderson Deposition, pages 81, 82. However, attached to Anderson's Affidavit, which was filed by the Defendants in support of the Motion for Summary Judgment, are several pages of documents. Although it is not clear because the document numbers referred to in Anderson's deposition are not evident in the documents provided to the court, it appears that the documents referred to in Anderson's deposition have been included by the Defendants as part of the evidence to substantiate their legitimate nondiscriminatory reason. While this evidence pointed to by Hughes may have created a question of fact as to whether some of the evidence provided to the court by the Defendants was actually relied upon by Anderson in making his assessment of Hughes' honesty and ability to perform his job, the question before the court is whether this question of fact discredits the employer's articulated reason for its employment action.

Defendant Cloud has stated in an Affidavit that his actions in recommending that Hughes be denied permanent status as a sergeant was based upon the report made by Anderson in which he concluded that Hughes could not perform the supervisory duties required of him. Affidavit of John Cloud, page 2. Hughes does not appear to dispute that the Department acted upon Anderson's con-

---

**5.** Hughes has provided the court with roughly ten pages of information denominated as "Undisputed Facts." Hughes does not direct the court as to which claims or elements of claims he feels these facts are relevant. To the extent that the court is able to discern that facts are relevant to a particular issue, the court has addressed those portions of the facts. One item of evidence provided by Hughes concerns the Department's treatment of another employee. Hughes states that a Department official said that it would be acceptable behavior for a subordinate employee to tell her supervisor that because she does not like him, he should not come into the office. Even assuming this event actually occurred, Hughes has provided no evidence of the person's race from which a comparison can be drawn for purposes of analyzing evidence of pretext.

clusion. It was Anderson's conclusion, therefore, and not the particular information on which Anderson used in making his report that formed the basis of the employment action.

In *Lewis–Calhoun v. City of Jackson,* 977 F.Supp. 1148 (S.D.Ala.1997), the court addressed a similar argument to that presented by these facts. The plaintiff in *Lewis–Calhoun* called into question the investigation made by the person who made a recommendation which was ultimately acted upon. The plaintiff argued that a person who gave an unfavorable recommendation lacked enough first hand knowledge to give an adequate recommendation. The court found that whether or not the employer should have relied on the recommendation, the plaintiff's evidence did not create a basis to disbelieve the explanation that the employment decision was based on the unfavorable recommendation. *Id.* at 1153; *see also Combs,* 106 F.3d at 1543 (stating that plaintiff's argument confuses disagreement about the wisdom of the articulated reason with disbelief about the existence of the reason and its application in the circumstances). Similarly, in this case, the question of fact about the information Anderson relied on does not discredit the Department's articulated reason that it acted based on Anderson's report that Hughes could not perform the supervisory duties required of him.

Furthermore, even if the court assumed that the Department made an assessment of Hughes' performance based on the collected evidence, and that a question of fact had been raised as to whether all of the evidence provided by the Department to this court was actually relied on, Hughes has failed to provide sufficient evidence for a reasonable fact finder to conclude that the employer's articulated reason is not worthy of credence.

In *Combs,* the Eleventh Circuit discussed a hypothetical situation in which an employer articulated a nondiscriminatory reason that an employee had been tardy nine times, while the employee presented evidence that the he had only been tardy seven times.

*Combs,* 106 F.3d at 1534. Even though a question of fact was raised as to the number of times that the employee was absent, the court stated that the inquiry was whether the employer's articulated reason of excessive lateness may reasonably be disbelieved, not whether the employee was late nine times as opposed to seven. *Id.* Applying this explanation of the pretext analysis which is required in the Eleventh Circuit, the court finds that the information gathered by Anderson including interviews and statements by co-employees supports the articulated reason of Hughes' inability to perform his supervisory duties. The evidence pointed to by Hughes does not discredit the articulated reason in that it does not contradict or call into question assessments made by employees of Hughes, or any of the other evidence. Instead, the evidence, to the extent that it appears to be probative at all, supports Anderson's conclusion. Although some of the information provided by the Defendant to this court may not have been relied on, that does not discredit the articulated reason under *Combs.*

### b. Evidence of Discriminatory Motive

■ Hughes states in his submission to the court that Edwin Johnson is a similarly situated comparator. Hughes's deposition testimony establishes that Edwin Johnson was an African–American State Trooper who was fired by the Department and was reinstated after a hearing. Hughes Deposition, pages 141–43. It is unclear to the court why Hughes refers to Johnson as a "comparator," since he is also an African–American. Furthermore, an employer's treatment of one other employee does not establish a pattern and practice. Therefore, the court concludes that this evidence does not establish that the Department's articulated reason is pretextual.

■ Hughes has provided statistical evidence to establish pretext. According to Hughes, the employment action taken against him was a part of an overall practice of the Department to discriminate on the basis of race.[6] Hughes has provided an ex-

---

6. The Department has objected to this court even considering the evidence provided by the Plaintiff, claiming that the evidence was disclosed in another lawsuit under a confidentiality agreement and so is not admissible in this case. The

Plaintiff has represented to the court that the exhibit, Exhibit 11, provided by the Plaintiff in this case was part of the discovery conducted in the prior, separate lawsuit, but that Exhibit 11 was not subject to the confidentiality agreement.

hibit which purports to list the employees who were disciplined by the Department from January 1992 until September of 1997. Hughes states that because 45% of the disciplinary actions were taken against African–Americans, there is evidence of discrimination on the basis of race. However, as the Defendants point out, Hughes has not provided this court with any evidence of the numbers of African–Americans employed by the Department of Transportation. Without a basis for comparison, there is no basis from which to conclude whether 45% is a disproportionately high number or not.

Hughes has, however, also pointed to a separate comparison and has argued that a statistical disparity between African–Americans who were terminated and white employees who were terminated is evidence of a pattern of intentional discrimination. "Statistics showing racial imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination." *McAlester v. United Air Lines, Inc.,* 851 F.2d 1249, 1259 (10th Cir.1988).

Hughes has provided evidence that there is a pool of 120 employees who were disciplined by the Department of Public Safety since January 1, 1992. Hughes further points out that of these 120 employees 54 African–Americans were disciplined and that of those 54 African–Americans, 16 (29.6%) were terminated, while only 11 of 66 white employees (16.7%) were terminated. *See* Exhibit 11.

The Defendants have responded to this evidence by stating that three employees have been demoted in the last five years and that all three of these employees are white. Hughes, however, argues states that this evidence is not reflected in Exhibit 11. The fact that demotions have apparently been listed separately from discipline and terminations could indicate that the action taken against Hughes was not a disciplinary action. However, without evidence to this effect, the court cannot conclude that the Defendants'

evidence undermines any probative value of Hughes' evidence with respect to Exhibit 11.

■ The Defendants have also argued, however, that Hughes' evidence is not probative because it does not account for the degrees of severity of the offenses for which the listed employees were disciplined. Federal courts have found that not all variables must be accounted for by a plaintiff when providing evidence of a statistical disparity for purposes of establishing pretext, rather than for establishing a prima facie case of discrimination. *See id.* at 1259; *Bruno v. W.B. Saunders Co.,* 882 F.2d 760 (3rd Cir. 1989) (holding that even though the plaintiffs statistics did not account for the minimum objective qualifications for the positions into which transfer or promotion was possible, they are relevant evidence of pretext). This approach has been followed by the Eleventh Circuit in limited situations. *See Miles v. M.N.C.,* 750 F.2d 867 (11th Cir.1985). In *Miles,* the Eleventh Circuit reversed a district court's determination that statistics were not probative because the data did not show whether white applicants were more experienced, more qualified, or had better experience. The court explained that because there were no specific qualifications or criteria for employment, "the statistics were not invalidated because they lacked variables to assess experience and qualifications." Id. at 872.

■ In this case, Hughes has provided evidence of a racial imbalance between African–American employees who were disciplined and white employees who were disciplined. It is possible that the "pool" of disciplined employees could be considered to be analogous to the pool of applicants in *Miles.* In *Miles,* it was clear that there were no additional criteria required for a person to move from the pool of applicants to a position with the company. In this case, there has been no evidence provided as to what criteria cause an employee to

---

The confidentiality agreement states that it extends to information in the personnel files of employees, Exhibit 11, however, does not appear to be information taken from a personnel file, but is instead a listing of persons against whom disciplinary actions were taken. The Plaintiff's attorney has also represented to the court that

Exhibit 11 was produced in response to an interrogatory in the prior case and was not taken from a personnel file. It appears, therefore, that Exhibit 11 falls outside of the scope of the confidentiality agreement. Therefore, the court finds that the Plaintiff may submit this evidence for purposes of this motion.

move from the pool of disciplined employees to being a terminated employee. If there are standards for distinguishing between the severity of various offenses, then it may ultimately be determined that Hughes' evidence is flawed and that he has failed to provide evidence of pretext. However, without such evidence, this court is unable to conclude that Hughes' evidence of a racial disparity has no probative value.

The Defendants have also argued, however, that Hughes' evidence of a discriminatory motive is not significantly probative given that the investigation of him was made by an African–American and given the evidence which supports the Department's articulated nondiscriminatory reason.

The court agrees that the probative value of Hughes' evidence is slight, in comparison to the evidence which was analyzed in *Miles*. In *Miles*, the court was not merely presented with raw statistics, but there was also expert testimony as to the significance of the statistical study. *Miles*, 750 F.2d at 873. Given the fact that the court has only raw statistics, and that these statistics may ultimately be undermined by a comparison with relevant factors, the court finds that Hughes' evidence is not as probative as was the evidence in *Miles*.

In addition, in *Miles*, the Eleventh Circuit expressly stated that discrimination had been proven by evidence of a racial slur, statistical evidence, comparative evidence, and evidence that no black employees had been employed in a particular year. *Id.* at 876. In this case, the only evidence which might tend to point to a discriminatory motive is statistical evidence. While it is certainly accepted in the Eleventh Circuit that statistical evidence may be used as evidence to show pretext, the court is aware of no Eleventh Circuit case holding that statistical evidence by itself is sufficient to show pretext. Federal courts outside of the Eleventh Circuit which have addressed the issue have found that statistical evidence is generally insufficient to rebut a valid, nondiscriminatory reason for employment action with regard to a particular employee. *See Equal Employment Opportunity Commission v. Texas Instruments Incorp.*, 100 F.3d 1173 (5th Cir. 1996); *LeBlanc v. Great American Insurance Company*, 6 F.3d 836 (1st Cir.1993).

As the Supreme Court has explained, the probative value of statistical evidence ultimately depends on all of the surrounding facts, circumstances, and other evidence of discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

The reasoning of other circuits is that "a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer [with regard to] a particular individual." *LeBlanc*, 6 F.3d at 847. Because specific intentions are relevant, courts require some connection between the statistics, the practices of the employer, and the employee's case. *See Gadson v. Concord Hosp.*, 966 F.2d 32, 35 (1st Cir.1992). Therefore, "it is the unusual case in which statistics alone can support a finding of intentional discrimination." *Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir.1992). This court is persuaded by the reasoning of these courts to conclude that a showing of pretext in the usual disparate treatment claim requires more than just statistical evidence.

Because Hughes' evidence is of questionable probative value, and because there is no evidence which ties these statistics to the employment decision at issue, this court finds that the facts of this case do not present a situation, if one exists, in which evidence of statistics alone will be sufficient to satisfy a plaintiffs burden in establishing pretext. Accordingly, the Defendants are entitled to summary judgment on the race discrimination claims under Title VII, § 1981, and § 1983.

### B. Due Process Claims

#### 1. Deprivation of a Property Interest

The Defendants have moved for summary judgment on Hughes' claim for a denial of a property interest in violation of the Due Process Clause of the Constitution of the United States, arguing that Hughes was not denied a property interest. Hughes has not addressed this claim in his response to the Motion for Summary Judgment.

The Defendants have argued that by being placed on mandatory annual leave, Hughes did not lose any salary or benefits, but was

merely required to take his leave, so that there has been no deprivation of a liberty interest. The court agrees that because Hughes has not provided evidence that he was actually deprived of his accumulated leave, Hughes has not made a claim for deprivation of a property interest based upon the leave itself. It may also be, however, that Hughes intends to assert a claim for deprivation of property based upon the fact that he had to take his annual leave at a particular time; that is, that he had a property interest in choosing the time at which he took his leave.

■ Property interests are not created by the Constitution but are "defined by existing rules or understandings that stem from an independent source such as state law" and arise only where the plaintiff demonstrates a "legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Not all work-related grievances rise to the level of a constitutional violation. *See Estes v. Tuscaloosa County, Ala.*, 696 F.2d 898 (11th Cir.1983).

■ The Defendants have pointed to, and have provided evidence of, state personnel regulations which provide for the placement of state employees on leave under certain circumstances.[7] According to the Defendants, Hughes' rights are defined by the state law, so he has been deprived of no protected property interest.

The Eleventh Circuit addressed an argument analogous to this one in *Callaway v. Block*, 763 F.2d 1283 (11th Cir.1985). In *Callaway*, the plaintiffs claimed a property interest in peanut quota allotments. The Eleventh Circuit explained that the Act which created the peanut quota also provided for when the allotments would be made. *Id.* Because the Act which created and defined the right to the allotment also provided for how much would be allotted, the plaintiffs had no protected property interest in specific quota allotments. *Id.* at 1290. Similarly, in

this case, Hughes was entitled to annual leave by virtue of state law. However, state law also defined the circumstances under which Hughes could be made to take this leave by the state. Therefore, Hughes had no legitimate claim to entitlement to being able to choose the time at which to take annual leave. *See also McNill v. New York City Department of Correction*, 950 F.Supp. 564 (S.D.N.Y.1996) (finding no protected property interest in lost preferences for when could take vacation time, which holidays could be taken off, and in access to voluntary overtime). Consequently, the court concludes that the Defendants are entitled to summary judgment on the property interest claim based on mandatory annual leave.

2. Deprivation of a Property Interest by Constructive Discharge

■ A plaintiff may bring a § 1983 claim for deprivation of a property interest in employment without due process if the plaintiff has been constructively discharged. Hughes argues that although he was not expressly terminated from his position, he was constructively discharged. Hughes states that he had been stationed in Huntsville for 22½ years, that his wife and family were well-settled in the area, and they were purchasing a home, and that Defendant Cloud expressed surprise when he learned that another Department employee was moving to Montgomery because she was "homesteaded" in the Quad Cities. According to Hughes, a transfer to Dothan, Alabama in light of these circumstances meant that Hughes was constructively discharged.

■ The Eleventh Circuit has clearly recognized that a constructive discharge may occur when a resignation from public employment that has been requested by an employer is sufficiently involuntary to trigger the protections of the due process clause. *Hargray v. City of Hallandale*, 57 F.3d 1560

---

7. Rule 670–X–15–.06 states:

(1) An appointing authority, with the approval of the Personnel Director, may require an employee to use accumulated annual leave under certain circumstances when the appointing authority deems the employee's absence from work to be in the best interests of the agency. Examples of such circumstances would include

a period of time when the employee is under investigation leading to disciplinary proceedings, the period of time pending a disciplinary hearing after the employee has received notice of such hearing, and ...

The court notes that there has been no challenge made to the Constitutionality of this regulation.

(11th Cir.1995). Under *Hargray*, if a plaintiff seeks to show that he was forced to resign by coercion or duress, a court must decide if, under the totality of the circumstances, the employer's conduct in obtaining the resignation deprived the employee of free will in choosing to resign. *Id.* at 1568.

Hughes has argued that under *Hargray*, the evidence indicates that his resignation was not voluntary, but was coerced. The court finds, however, that the *Hargray* analysis cannot be meaningfully applied to Hughes' claim because the *Hargray* analysis applies to circumstances in which the employer has given the employee a choice between alternatives, but the evidence establishes that the employee has no real choice and was actually coerced into resigning. *See id.* (factors include consideration of whether employer gives employee an alternative to resigning, whether the employee understood the nature of the choice, and was given a reasonable amount of time in which to choose). In this case, the Department did not offer Hughes a choice between resignation (or retirement) and another alternative. Instead, the facts before the court indicate that the Department gave Hughes a probationary promotion, later conducted an investigation of Hughes, Hughes subsequently inquired about retirement, the Department decided not to make Hughes' promotion permanent, and the Department decided to transfer Hughes to Dothan. There was no coercion or duress within the meaning of *Hargray* because this was not a situation in which a resignation from public employment has been requested by an employer. *See id.* at 1568.

The court recognizes, however, that other courts have recognized a different theory under which a § 1983 claim of constructive discharge may be brought. The Tenth and Fifth Circuits, in particular, have recognized that a plaintiff may bring a claim for constructive discharge where the public employer made working conditions so intolerable that the employee was forced to resign involuntarily. *See Bailey v. Kirk*, 777 F.2d 567 (10th Cir.1985); *Jett v. Dallas Independent School District*, 798 F.2d 748 (5th Cir.1986). Although this theory of liability has not been applied by the Eleventh Circuit, the Eleventh Circuit also apparently has not declined

to adopt such a theory. In fact, this analysis has also been applied by district courts in the Eleventh Circuit. *Brewer v. Purvis*, 816 F.Supp. 1560 (M.D.Ga.1993); *Kamenesh v. City of Miami*, 772 F.Supp. 583 (S.D.Fla. 1991).

Under the analysis in *Jett*, a constructive discharge occurs when an employer makes working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Jett*, 798 F.2d at 755. The inquiry before this court, therefore, is if there is a question of fact as to whether Hughes' transfer was so intolerable that a reasonable person in Hughes' situation would have felt compelled to resign.

In *Jett*, the Fifth Circuit stated that a transfer or demotion in some instances may constitute a constructive discharge, but concluded that a transfer which the plaintiff alleged entailed a significant loss of responsibility was not so intolerable that a reasonable person would have felt compelled to resign. *Jett*, 798 F.2d at 755. The court noted that a constructive discharge cannot be based upon the employee's subjective preference for one position over another. *Id.* The court explained that although the plaintiff desired to continue in his current position, his new working conditions were not so difficult or unpleasant that he had no choice to resign. *Id.*

In this case, Hughes has argued that the assignment to Dothan would have entailed hardship because of his ties in Huntsville. Hughes has made no argument that the working conditions of the Dothan position would be intolerable. The court cannot conclude that Hughes has presented evidence to support a finding that the working conditions in the Dothan position were so intolerable that a reasonable person would be forced to resign. Although Hughes has not made this argument, even if the court assumes that the Dothan position required less responsibility, under *Jett*, there is insufficient evidence before the court from which to conclude that the new working conditions were so difficult or unpleasant that Hughes had no choice but to resign. *See id.* at 755.

The reason pointed to by Hughes that the transfer in this case was a constructive discharge is that the transfer would have meant leaving the Huntsville area where he and his family had lived for 221/2 years. Other courts addressing the issue of constructive discharge have concluded that when an employee resigns rather than accept a transfer for personal reasons, the employee has not been constructively discharged. *See Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467 (8th Cir.1990) ("Smith's belief that he could not accept the job because of financial considerations cannot constitute 'intolerable working conditions.'"); *Darnell v. Campbell County Fiscal Court,* 731 F.Supp. 1309 (E.D.Ky.1990) (mere subjective preferences of the plaintiff are insufficient to turn a transfer of location into a constructive discharge), *aff'd,* 924 F.2d 1057 (6th Cir.1991); *Cherchi v. Mobil Oil Corp.*, 693 F.Supp. 156 (D.N.J.1988) (personal reasons making plaintiff unwilling to move did not constitute objectively intolerable conditions), *aff'd,* 865 F.2d 249 (3rd Cir.1988). It appears that when courts do find that there is evidence of a constructive discharge, the personal reasons are accompanied by other factors. *See Touchet v. Halliburton Co.,* 78 F.3d 598, 1996 WL 93974 (10th Cir. Feb.29, 1996) (unpublished disposition) (constructive discharge where employee was demoted to a job with lower pay and status, had a serious medical condition which could have lead to risks if accepted the position, and there was evidence that employee was encourage to retire rather than accept the transfer).

In light of these cases, the personal reasons identified by Hughes do not constitute circumstances which would rise to the level of intolerable working conditions. Although Hughes has stated that he is buying a home, he has provided no evidence to the court of any incurred costs. Without more, Hughes' statement does not establish that there were objectively intolerable conditions. *See Smith,* 895 F.2d at 473 (rejecting a plaintiff's statement that selling his house in a depressed market was too onerous a burden, reasoning that refusing a job offer without attempting to sell his house made his statement speculative). Furthermore, Defendant Cloud's statement that he was surprised that a person accepted a transfer who was "home-steaded" is not evidence that Hughes was encouraged to retire, since Cloud states in his deposition that he merely recommended that Hughes be taken out of the ABI, and that Defendant Hagan made the decision of where to transfer Hughes. Cloud Deposition, page 106–07. Because Hughes' evidence of a transfer, without more, does not establish that he was subjected to objectively intolerable conditions, the court concludes that he has failed to establish a claim of constructive discharge.

■ Even if Hughes' evidence did present a question of fact as to the issue of constructive discharge, Hughes has not demonstrated that the individual Defendants would not be entitled to qualified immunity on this claim. Under the doctrine of qualified immunity, the burden is on the plaintiff to prove that the defendant engaged in conduct that violated "clearly established law." *Jordan v. Doe,* 38 F.3d at 1559, 1565 (11th Cir.1994). "Clearly established" means that "[t]he contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc). Under this standard, qualified immunity is available unless "a government agent's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing...." *Id.* at 1149.

It is clearly established in the Eleventh Circuit that a choice between two offered alternatives, which an employee must make under duress or coercion, is a violation of the employees' constitutional rights under *Hargray*. However, no binding decision has been cited by the Plaintiff, nor found by this court, which clearly establishes that a transfer of an employee, which the employee does

not want for personal reasons, can constitute creating intolerable working conditions as a basis for constructive discharge.[8] *See Barnette v. Folmar*, 64 F.3d 598 (11th Cir.1995) (analyzing a case in which the facts occurred prior to *Hargray* and holding that qualified immunity applies where public officials could not have known that their actions would amount to constructive discharge that would violate the plaintiffs' rights to due process). Consequently, the court concludes that the Defendants are entitled to summary judgment on Hughes' claim for damages on the basis of constructive discharge.

### 3. Liberty Interest

Hughes has argued that stigmatizing and defamatory information placed in his personnel file have deprived him of a liberty interest so that he is entitled to a name-clearing hearing. The Supreme Court of the United States has made it clear that to establish a claim under § 1983 requires more than evidence that there is defamation by a state official. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). "[A] hearing is not required each time the State in its capacity as employer might be considered responsible for a statement defaming an employee who continues to be an employee." *Id.*, 424 U.S. at 709.

 The Eleventh Circuit has set out the elements to a claim of deprivation of a liberty interest without due process of law as being (1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) made public, (5) by the governmental employer, (6) without a meaningful opportunity for employee name clearing. *Buxton v. City of Plant City, Florida*, 871 F.2d 1037 (11th Cir.1989).

The Defendants have argued that Hughes has failed to show that any allegedly stigmatizing information was made public since any information kept in the personnel files maintained by the Department is kept confidential and may not be removed or reviewed without authorization of the Director, Assistant Director, or Division Chief. *See* Department of Safety Policy Order No. 33. However, Hughes does not appear to argue that information within files maintained by the Department of Public Safety were published, but instead states that the Probationary Performance Appraisal and Performance Planning Form are contained within his state personnel file, which is a matter of public record.

■ In the Eleventh Circuit, when a personnel file becomes a public record by law, the personnel file has been made public. *Buxton v. City of Plant City, Florida*, 871 F.2d 1037 (11th Cir.1989). Under the Alabama Code, records of the Personnel Department are public records open to public inspection. *See* Ala.Code § 36–26–44 (1991).

The Defendants have argued that they are not the persons who put the information into Hughes'• state personnel file, that they only put the information into Hughes' Department of Public Safety personnel file. Whether or not the Defendants intended to make the information public is not the dispositive issue in this case. *See Buxton*, 871 F.2d at 1044 (rejecting defendants arguments that information was required by statute so there was no intent to make the information public). Although it is not clear from the facts in this case, it appears to be a logical inference, which must be drawn in favor of the plaintiff in deciding a defendant's motion for summary judgment, that the Department of Public Safety furnished the information in dispute in this case to the State Personnel Department, where it became a public record by law. "[T]he presence of stigmatizing information placed into the public record by a state entity, pursuant to a state statute or otherwise, constitutes sufficient publication to implicate the liberty interest under the due process clause." *Id.* at 1046. Therefore, the court concludes that the Defendants' argument that the information was not made public is unavailing.

 The Defendants also argue, however, that even if allegedly stigmatizing information was made public, it was not done incident to a termination and, therefore, does not implicate a liberty interest. The court agrees that the elements of the claim as set

---

**8.** The court has researched cases relied on by the court in *Jett* and is unaware of any binding precedent from the former Fifth Circuit holding that a transfer which the employee resists for personal reasons may constitute a constructive discharge.

forth in *Buxton* reference a "discharge." *Id.* at 1042. The Eleventh Circuit has apparently not spoken to the question of whether a constructive discharge will satisfy the *Buxton* standard, although other courts have considered a constructive discharge as a "discharge." *See e.g., Sims v. City of New London,* 738 F.Supp. 638 (D.Conn.1990). It is not clear which standard for constructive discharge would be applied in this situation. However, as was previously discussed, Hughes has not provided sufficient evidence to establish constructive discharge under the Eleventh Circuit's analysis in *Hargray,* or under the alternate analysis applied by the Fifth and Tenth Circuits.

At least one federal court interpreting *Buxton* has concluded that it is incorrect to conclude, based on cases involving discharge, that only stigmatization which occurs in connection with a discharge can implicate a liberty interest. *See Kamenesh v. City of Miami,* 772 F.Supp. 583 (S.D.Fla.1991). The *Kamenesh* court reasoned that a right or status created by state law must be significantly altered or extinguished. *Id.* at In other words, if the employment action is not a termination of employment, then the action must implicate a right or status that is created by state law.

The former Fifth Circuit explained that a significant demotion might present the type of loss of tangible interest connected with stigmatizing state action that could give rise to a liberty interest. *Moore v. Otero,* 557 F.2d 435 (5th Cir.1977). Other courts have also recognized that an injury to a right or status which is recognized by state law in the form of a demotion could implicate a liberty interest. *Mtingwa v. North Carolina Agricultural and Technical State University,* 114 F.3d 1176, 1997 WL 303346 (4th Cir.1997) (unpublished disposition).

The Fifth Circuit has explained in *Moore* the extent to which an employment action can be considered an injury to a right or status recognized by state law. In *Moore,* the court held that a police officer who was transferred from the position of corporal, with quasi-supervisory powers, to that of patrolman, with no supervisory powers, was not deprived of a liberty interest even if there were stigmatizing charges because he retained employment. *Id.* at 591.

In this case, although Hughes was demoted from his probationary position back to his former position, he had no interest in his probationary position. The only state-created interest that he had was in the position that he had prior to being promoted on a probationary basis. The state-created interest in this position was only affected to the extent that he was transferred from one location to another. Consequently, the mere transfer from Huntsville to Dothan, since there is no evidence that this transfer was a demotion, nor that he suffered a loss of pay as a result of this transfer, does not implicate a liberty interest under the former Fifth Circuit's analysis in *Moore.* As the court explained in *Moore,* an internal transfer must constitute such a change of status so as to be regarded essentially as a loss of employment to sustain a claim for deprivation of a liberty interest. *Id.* at 438.

Other courts addressing the issue of a transferred employee have held that a mere transfer without a loss in pay, even when combined with potentially stigmatizing information, does not implicate a liberty interest. *See Sullivan v. Brown,* 544 F.2d 279, 283 (6th Cir.1976). In other words, even if a discharge is not required, Hughes has failed to provide evidence of an action by his employer in which a state law-created right or status was distinctly altered or distinguished.

In addition, Hughes has failed to establish that the individual defendants would not be entitled to qualified immunity. Hughes has not pointed to, and the court is unaware of any, binding precedent holding that stigmatizing information placed in the personnel file of a transferred employee deprives that employee of a liberty interest. Consequently, the court concludes that the Defendants are entitled to summary judgment as to Hughes' claim for deprivation of a liberty interest.

### C. State Law Claims

Hughes has sought to bring three Counts against the Defendants under the Alabama Constitution. Hughes argues in his brief in Opposition to Summary Judgment that no motion seeking judgment on these state law claims has been made in this court by the Defendants. While the Defendants do not address the state law claims in their original

Brief in Support of the Motion for Summary Judgment, the Defendants explain in their Reply to the Plaintiff's Response that it was their intention to move for summary judgment on these claims, and the Defendants argue that the court should grant summary judgment on these claims. The Plaintiff subsequently filed a response to the Defendants' Response. Although the Plaintiff did not address the state law claims in this Response, the Plaintiff had an opportunity to do so. Therefore, the court will address the propriety of summary judgment as to the state law claims.

In ruling on the Motion to Dismiss, this court noted that it was unclear what state constitutional claims Hughes' attempted to assert. The court, therefore, gave Hughes leave to amend his Complaint to state claims under the Alabama Constitution, but also required Hughes to state the legal authority upon which he sought to bring claims for damages and injunctive relief under the Alabama Constitution. In the Amended Complaint, Hughes has cited the court to Alabama cases applying various provisions of the Alabama Constitution, but still has not indicated the authority under which he seeks to bring claims in this case. Therefore, the court must decide without guidance from the parties whether the claims sought to be brought may be asserted in federal court.

First, the court must address the question of Eleventh Amendment immunity. The court also notes that there is at least a degree of ambiguity as to the nature of the defense of Eleventh Amendment immunity in the Eleventh Circuit. *See Smith v. Avino*, 91 F.3d 105 (11th Cir.1996) ("Eleventh Amendment immunity is considered to be in the nature of subject matter jurisdiction and cannot be waived by the parties."); *Bouchard Transportation Co. v. Florida Department of Environmental Protection*, 91 F.3d 1445 (11th Cir.1996) (stating that the Supreme Court held that Eleventh Amendment immunity does not have to be raised sua sponte, but that it is in the nature of a jurisdictional bar and may be raised for the first time on appeal). Since the defense may be raised at any time, however, and because the court finds that the Defendants have not expressly waived this defense, the court will address application of Eleventh Amendment immunity, rather than allowing Hughes' claims to go to trial and addressing qualified immunity at a later stage. *See Bouchard*, 91 F.3d at 1448–49 (ruling on Eleventh Amendment immunity should not be unnecessarily postponed).

The Eleventh Amendment bars this court from considering state law claims against the Department. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The court finds no evidence that the state has consented to being sued for state constitutional violations. Additionally, the United States Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), precludes this court from considering pendent state law claims that a state official is acting in violation of state constitutional law, because a claim that state officials violated state law in carrying out their official responsibilities is a claim against the state. *Silver v. Baggiano*, 804 F.2d 1211 (11th Cir.1986). Therefore, the court concludes that the Defendants are entitled to judgment on Hughes' state law claims against the Department and the individual defendants in their official capacities. *See Hemperly v. Crumpton*, 708 F.Supp. 1247 (M.D.Ala.1988) (finding that claims for violation of the Alabama Constitution as against the state and state officials were due to be dismissed under doctrine of Eleventh Amendment immunity).

Although requested to do so by Order of this court, Hughes has not indicated to the court the mechanism by which he is entitled to bring a claim against the individual Defendants in their individual capacities under the Alabama Constitution, nor has he shown that these purported rights were rights which existed at common law. This court is unaware of any enabling statute equivalent to 42 U.S.C. § 1983, or any case law providing for a *Bivens*-type action. *See also Ross v. Alabama*, 893 F.Supp. 1545 (M.D.Ala.1995) (expressing an inability to find an enabling statute or case law providing that such a cause of action exists). Although Hughes has cited exceptions to the doctrine of sovereign immunity in his Third Amended Complaint, these exceptions do not establish that

there is a mechanism whereby a claim for damages may be brought under the Alabama Constitution. Consequently, the court concludes that the Defendants are entitled to judgment on Hughes' claims asserted under the Alabama Constitution.

## V. *CONCLUSION*

For the reasons discussed, the court concludes that the Defendants' Motion for Summary Judgment is due to be GRANTED as to all claims.

Furthermore, since the Defendant, Halycon Ballard, is in the case only as a formal party for the purpose of complete relief, and since summary judgment is entered as to all other Defendants, this action is due to be dismissed as to Halycon Ballard.