**Michael L. CARR, Plaintiff,**

v.

**William S. COHEN, Secretary of Defense, Defendant.**

**No. Civ.A. 97–D–1033–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 3, 1999.

Julian L. McPhillips, Jr., Montgomery, AL, for plaintiff.

Leura J. Garrett, U.S. Attorney's Office, Montgomery, Alabama, Robert E. Sutemeier, U.S. Dept. Defense, Pensacola, FL, for defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are Defendant's Motion For Summary Judgment, Statement Of Material Facts As To Which There Is No Genuine Issue ("Def.'s Facts"), and Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment ("Def.'s Mem."), all filed on October 28, 1998. Plaintiff filed his Opposition Response and accompanying Brief In opposition To Defendant's Motion For Summary Judgment, which the court construes as a Response ("Pl.'s Resp."), on November 16, 1998, and his Supplement To Plaintiff's Opposition Response on November 30, 1998. Also on November 30, 1998, Defendant filed his Reply ("Def.'s Reply"). After careful consideration of the

arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's Motion For Summary Judgment is due to be granted.

## JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 2201, and 2202 and 29 U.S.C. § 633a, et seq. The parties do not contest personal jurisdiction or venue.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Anderson*, 477 U.S. at

249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## FACTUAL BACKGROUND

Plaintiff was born on August 1, 1928 and was over 40 years of age at all times relevant to the above-styled action. (Second Am.Compl. ¶ 4.) Plaintiff served as superintendent of Maxwell Air Force Base Domestic Dependent Elementary and Secondary Schools ("Maxwell DDESS")[1] from December 6, 1971 until August 15, 1996, at which time he retired. (Pl.'s Resp. at 1.) At all times relevant to the above-styled action, Dr. Hector Nevarez ("Dr.Nevarez") was the DDESS Director, was Plaintiff's first-line supervisor, and rendered annual performance appraisals of Plaintiff. (Def.'s Facts at 10.)

Plaintiff claims that his retirement constituted constructive discharge. (Pl.'s Resp. at 1.) According to Plaintiff, Defendant through Dr. Nevarez engaged in a plan of harassment, motivated by ageist animus, which created intolerable working conditions that forced Plaintiff to retire.[2] Plaintiff states that Dr. Nevarez "kept telling all the superintendents that superintendents' salaries are too high and you

older superintendents are making too much. I've got to get them down." (Carr Dep. at 39.)

Plaintiff and his wife both worked at Maxwell DDESS when they decided to marry in 1989. (*Id.* at 141.) At that time, they were aware that a nepotism regulation existed. (*Id.*) They were not familiar with the regulation's particulars, however, so they consulted the civilian personnel office at Maxwell Air Force Base to determine whether they would be in violation of the regulation by marrying. (*Id.*) Mrs. Carr was a librarian and Plaintiff, as superintendent, was her second-line supervisor. (*Id.*) They were informed that the regulation would not be violated because Plaintiff would not be his wife's first-line supervisor. (*Id.*) Plaintiff claims that, when Dr. Nevarez became Director of DDESS, he was aware of this spousal employment situation and never questioned it until 1996. (*Id.*)

In June 1994, the State of Alabama approved an 8.5% pay increase for all education personnel. (Def.'s Facts at 2.) The Maxwell School Board approved an 8.5% pay increase for Plaintiff, effective July 1, 1994. (*Id.*; Carr Dep. at 50.) Despite the 8.5% pay increase approved by the School Board, the other two Alabama DDESS superintendents had their raises approved by Dr. Nevarez, who approved a 6.5% raise.[3] (Stewart Dep. at 34.) In August

---

1. To the court's understanding, DDESS school systems exist in several states. Each state may have more than one school system. At all times relevant to the above-styled action, the Alabama DDESS system was composed of three school systems: Maxwell DDESS, Fort Rucker DDESS, and Fort McClellan DDESS. Plaintiff was the superintendent for Maxwell DDESS, which contained several schools.

2. Specifically, Plaintiff claims the following events comprised intolerable working conditions:

   1) having to return money to the government after the school board had approved his salary increase; 2) being excluded from the June 1996 superintendents' conference, due to Dr. Nevarez intentionally scheduling it when he knew [Plaintiff] would not be

able to attend; 3) having Dr. Nevarez make derogatory remarks about [Plaintiff] in an open forum of other DDESS Superintendents; 4) having the threat of either having to terminate his wife or lose his own position, which he had held with distinction for twenty-five years; 5) having his involvement in professional activities severely limited by Dr. Nevarez; 6) having an investigation of [Plaintiff's] SACS involvement at Maxwell AFB DDESS School; 7) having the language of the VSIP more restrictive [than] it had been in the past; and 8) the reorganization plan of Dr. Nevarez only affected three states, those with the three oldest superintendents.
   (Pl.'s Resp. at 14.)

3. The record is unclear concerning the exact amount of the raise for Dr. Stewart, another DDESS superintendent, for the 1994–1995

1994, Dr. Nevarez sent a memorandum to all DDESS superintendents reminding them that all pay increases for superintendents had to be approved by him. (Def.'s Facts at 3.) In August 1994, Dr. Nevarez met with Plaintiff to discusses Plaintiff's raise. (Carr Dep. at 44.) Dr. Nevarez did not mention Plaintiff's age, but "it was very clear in meetings to all of us that the salaries were high, particularly the older superintendents, and [Dr. Nevarez] had to get them down." (*Id.* at 53.)

In November 1996, Dr. Nevarez approved a 6.5% pay increase for all three Alabama DDESS superintendents for the 1994–1995 school year. (Def.'s Facts at 3.) Plaintiff filed a grievance because his raise was decreased from 8.5% to 6.5%, but the grievance was denied. (*Id.* at 3.) On November 8, 1994, Dr. Nevarez sent Plaintiff a memorandum requesting that Plaintiff pay back the salary increase he had received in excess of 6.5%. (Pl.'s Resp. at 4.)

Dr. Nevarez was in charge of scheduling a June 1996 superintendents' conference ("Conference"), which had to be rescheduled several times. (Carr Dep. at 82.) Plaintiff informed Dr. Nevarez that he would not be available the weekend of June 3–5, 1996 because of previously scheduled vacation plans. (*Id.* at 79.) Dr. Nevarez scheduled the Conference for that weekend. (*Id.*)

At the Conference and while addressing a group of superintendents, Dr. Nevarez referred to Plaintiff and his wife's employment situation and stated that Plaintiff "needed to retire and that he was—it was going to be either [Plaintiff] or [his] wife." (Carr Dep. at 80.)

Also at the Conference, Dr. Nevarez directed the superintendents to report any employment situation involving employees who were relatives. (Def.'s Facts at 5.) Over 125 instances were reported, but only

one superintendent was related to another employee within the same school district—Plaintiff. (*Id.* at 6.) Also at the Conference, Dr. Nevarez "made some remarks about [Plaintiff's] age" (Carr Dep. at 80) and said that "it was time for [Plaintiff] to retire, due to his age." (Pirkle Aff. ¶ 1.)

Thereafter, pursuant to the advice of the DDESS General Counsel's office, Dr. Nevarez sent Plaintiff a memorandum, dated June 13, 1996, informing Plaintiff that he and his wife were in violation of the nepotism regulation and requiring Plaintiff to "correct this situation immediately and report to [Dr. Nevarez] the action taken." (Carr Dep. Ex. 3.) By memorandum dated July 3, 1996, Plaintiff requested reconsideration of this directive but received no response prior to his retirement.

Throughout his career at Maxwell DDESS, Plaintiff was affiliated with various professional organizations, including the Southern Association of Colleges and Schools ("SACS"). (Dorton Aff. ¶ 3.) Plaintiff worked with the Alabama DDESS schools on accreditation programs and reports. (Carr Dep. at 55.) In 1995, Plaintiff became the Executive Director of the Alabama Elementary and Middle School Committee of SACS ("Committee"). (Def.'s Facts at 3.) The Committee's office and official address were listed as the Maxwell DDESS address (*Id.* at 3), although Plaintiff claims that "[t]here was no SACS office. There was—I was in a professional role, and I had an office. I was carrying out my role, but Southern Association had no office." (Carr Dep. at 57.) Plaintiff was also involved in other professional activities.

In February 1996, Plaintiff called Dr. Nevarez concerning Plaintiff's request to participate in a workshop. (*Id.* at 66.) Dr. Nevarez denied the request because

---

school year. In her deposition, Dr. Stewart stated that Dr. Nevarez approved a 6.0% raise for her. (Stewart Dep. at 34.) However, Defendant claims that Dr. Nevarez approved a 6.5% pay increase for all three Alabama

DDESS superintendents. The court finds that this discrepancy does not concern a material fact and, for the sake of uniformity, accepts that Dr. Stewart's raise was always 6.5%.

Plaintiff was "involved in too much and he was going to cut it out." (*Id.*)

On April 3, 1996, Plaintiff was invited by the National Association of Elementary School principals to serve as a member of the National Educational Leadership Constituent Council. Dr. Nevarez discouraged Plaintiff's participation and told Plaintiff that he would have to take annual leave to participate. (Def.'s Facts at 4.)

On March 22, 1996, Dr. Nevarez conducted an inquiry into the relationship between DDESS and SACS. (Carr Dep. at 42; Def.'s Facts at 4.) Subsequently, the DDESS General Counsel's office determined that the existing relationship violated the Joint Ethics Regulations. On June 13, 1996, Dr. Nevarez sent Plaintiff a letter, prepared by the DDESS General Counsel's office, directing Plaintiff to take certain actions to bring the relationship into compliance.[4] (Def.'s Facts at 4.) By letter dated July 3, 1996, Plaintiff requested reconsideration and clarification of Dr. Nevarez's memorandum. (Carr Dep. at 62.) Plaintiff received no response. (*Id.* at 73.)

DDESS offered its employees a Voluntary Separation Incentive Pay program ("VSIP") for fiscal years 1994–1996. (Def.'s Facts at 6.) In 1996, the VSIP procedures for the first time provided that, "once an employee has been offered and accepted VSIP, the acceptance (and separation) commitment can not [sic] be withdrawn" and "offers of VSIP will be conditional on the applicant's separation from federal service not later than August 15, 1996." (*Id.* at 6–7.) Employees received further information which stated, inter alia, that "employees who apply for VSIP, are offered VSIP, and thereafter accept, must sign a statement ... confirming the voluntary nature of the action and indicat-ing that their decision is irrevocable." (*Id.* at 7.)

Plaintiff submitted an application for VSIP on June 15, 1996. (Pl.'s Resp. at 9.) Dr. Nevarez approved Plaintiff's application and authorized a formal tender of VSIP. (Def.'s Facts at 7.) In July 1996, the Human Resources Office ("HRO") contacted Plaintiff because his paperwork did not contain all the requisite language for VSIP retirement. (*Id.* at 8.) Specifically, the application lacked the language concerning voluntariness, position abolishment, revocation, and repayment of the incentive upon re-employment with the federal government. (*Id.*) Plaintiff asked HRO to provide regulatory authority supporting the mandatory inclusion of this language, which HRO did. (Carr Dep. at 25–26.) On July 17, 1996, Plaintiff made his final decision to retire and resubmitted the application containing the requisite language. (*Id.* at 87.)

During the last week of July 1996, Dr. Nevarez proposed consolidating the DDESS school districts in three states, including Alabama. (Def.'s Facts at 9.) Under this plan, these districts would be run under one superintendent in each state, rather than having a superintendent for each school district within each state. (*Id.*) In early August, 1996, Dr. Nevarez notified Dr. Stewart that she was to be the DDESS superintendent for Alabama. (*Id.* at 10.) The consolidation plan saved DDESS over $350,000 annually in salaries and benefits. (*Id.*)

Plaintiff retired effective August 15, 1996. (*Id.* at 9.) On July 3, 1997, Plaintiff commenced this action. Plaintiff alleges that Defendant violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a. Plaintiff seeks an injunction restraining Defendant from further

---

4. Specifically, Dr. Nevarez directed Plaintiff to: (1) relocate the SACS office; (2) take annual leave or obtain approval for excused absence to attend SACS and Committee meetings and conferences; (3) institute controls to ensure that SACS Committee staff work done by Maxwell DDESS employees would not take place during DDESS duty hours; and (4) require Maxwell teachers making certain accreditation visits to travel on government orders. (Def.'s Facts at 4.)

discrimination against Plaintiff, damages, costs and attorneys' fees, and any other relief to which he may be entitled.

On October 28, 1998, Defendant filed his Motion For Summary Judgment, contending that: (1) Plaintiff cannot establish a prima facie case of age discrimination; and (2) in the alternative, Defendant has articulated legitimate, nondiscriminatory reasons for his actions, and Plaintiff has produced insufficient evidence to establish a genuine issue regarding pretext.

## DISCUSSION

The ADEA provides that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to be subject to the ADEA's protections, an employee must be "at least 40 years of age." *Id.* at § 631(a).

■■■ An ADEA claim may be predicated upon a claim of constructive discharge. *See Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir.1988). To succeed on an ADEA claim based on constructive discharge, a plaintiff must make a twofold showing: "that the employer's actions were impermissibly motivated by the plaintiff's age, and that these actions made the plaintiff's working conditions so intolerable that resignation is deemed involuntary." *Cook v. American Gen. Life & Accident Ins. Co.,* 952 F.Supp. 1505, 1512 (M.D.Ala.1996) (quoting *Griswold v. Alabama Dept. of Indus. Relations,* 903 F.Supp. 1492, 1496 (M.D.Ala. 1995)); *see also Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997). "In assessing constructive discharge claims, [courts] do not consider a plaintiff's subjective feelings about his employer's actions. Rather, [courts] determine whether 'a reasonable person in [the plaintiff's] position would be compelled to resign.'" *Doe v. Dekalb County Sch. Dist.,*

145 F.3d 1441, 1450 (11th Cir.1998) (quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989)).

To survive a motion for summary judgment, a plaintiff must demonstrate a prima facie case, which may be done by presenting either direct, circumstantial, or statistical evidence. *See Cook,* 952 F.Supp. at 1509. Once a plaintiff satisfies the prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* at 1509 (citing *Carter v. City of Miami,* 870 F.2d 578, 584 (11th Cir. 1989)). If defendant meets this burden, "the burden returns to the plaintiff to prove by significantly probative evidence that the proffered evidence is a pretext for discrimination." *Carter,* 870 F.2d at 584.

Plaintiff asserts that, motivated by ageist animus, Dr. Nevarez undertook the following actions to create intolerable working conditions: (1) required Plaintiff to return money to the government after the school board had approved his salary increase; (2) excluded Plaintiff from the June 1996 superintendents' Conference; (3) made ageist remarks about Dr. Carr in an open forum of other DDESS superintendents; (4) threatened Plaintiff with either having to terminate his wife or lose his own position; (5) severely limited Plaintiff's involvement in professional activities; (6) investigated Plaintiff's SACS involvement at Maxwell DDESS; (7) made the language of the VSIP more restrictive than it had been in the past; and (8) created the reorganization plan to affect only three states, those with the three oldest superintendents. (Pl.'s Resp. at 14.)

For the purposes of this Opinion, the court assumes that Plaintiff has established a prima facie case and focuses its attention on whether Defendant meets its burden to state a legitimate, nondiscriminatory reason for the adverse employment action. As detailed below, the court finds that Defendant has satisfied this burden. Further, the court finds that Plaintiff is

unable to prove by significantly probative evidence that Defendant's proffered non-discriminatory reasons are a pretext for discrimination.

■ First, Plaintiff claims that he was discriminated against because he was required to return money to the government after the School Board had approved his salary increase. Specifically, Plaintiff claims that an 8.5% salary increase was approved for him by the School Board, and he received this increased pay from July through November 1994. In November, Dr. Nevarez reduced Plaintiff's raise to 6.5%, retroactive to July 1994, and ordered Plaintiff to pay the government the excess money he had received. Plaintiff claims that this was a discriminatory act and that at least one other superintendent, Dr. Stewart, did not have to pay back any money.

Defendant presents uncontroverted evidence that Dr. Stewart had her initial salary increase approved by Dr. Nevarez, and this raise was no more than 6.5%; thus Dr. Stewart had not received any excess money that needed to be returned. Further, Defendant provides evidence that Dr. Nevarez had the authority to approve superintendents' salary increases. Plaintiff presents no evidence that Dr. Nevarez's actions were motivated by ageist animus other than mere speculative, conclusory allegations. The court finds that Defendant has sufficiently demonstrated a legitimate reason for the adjustment of Plaintiff's salary, and Plaintiff has failed to demonstrate adequately a pretext.

■ Plaintiff further claims that he was "excluded from the June 1996 superintendents' conference[ ] due to Dr. Nevarez intentionally scheduling it when he knew [Plaintiff] would not be able to attend." (Pl.'s Resp. at 14.) Plaintiff provides only conclusory allegations in support, which the court finds insufficient to support this contention.

■ Additionally, Plaintiff contends that, at the 1996 Conference, Dr. Nevarez made comments about Plaintiff's age and said that "it was time for [Plaintiff] to retire, due to his age." (Pirkle Aff. ¶ 1.) The Eleventh Circuit recently articulated that "[t]he ADEA does not prohibit an employer from making an employment decision on the basis of higher salaries ... even though these characteristics are often correlated with an employee's age." *Broaddus v. Florida Power Corp.*, 145 F.3d 1283, 1287 (11th Cir.1998) (citing *Hazen Paper v. Biggins*, 507 U.S. 604, 611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). "Congress enacted the ADEA to combat unproven stereotypes that employers might harbor regarding the decreased abilities of older workers." *Id.* (citing *EEOC v. Wyoming*, 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)). "When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears." *Id.* (quoting *Hazen Paper*, 507 U.S. at 611, 113 S.Ct. 1701).

The court finds that the record amply demonstrates that Dr. Nevarez was concerned with superintendents' ages, but only as they correlated to salaries. For instance, according to Plaintiff, Dr. Nevarez "kept telling all the superintendents that superintendents' salaries are too high and you older superintendents are making too much." (Carr Dep. at 39.) Additionally, Plaintiff stated that "it was very clear in meetings to all of us that the salaries were high, particularly superintendents, and [Dr. Nevarez] had to get them down," referring particularly to the older superintendents. (*Id.* at 53.) Plaintiff provides no evidence to demonstrate that Dr. Nevarez made any decision motivated by a stigmatizing stereotype regarding the decreased abilities of older workers. Indeed, Plaintiff does not even make such an allegation. Thus, the court finds that Plaintiff has failed to demonstrate pretext on this point.

■ Next, the court addresses Plaintiff's assertion that Dr. Nevarez enforced

the nepotism regulation against Plaintiff because of ageist animus. Defendant claims otherwise and offers the following. At the June 1996 Conference, Dr. Nevarez directed the superintendents to report all employment situations within their respective school districts involving employees who were related. He subsequently received and submitted approximately 125 reports to the General Counsel's office for review. According to Defendant, Plaintiff was the only DDESS superintendent related to another employee within the same school. The General Counsel's office advised Dr. Nevarez that Plaintiff and his wife's employment situation violated the nepotism regulation. (Def. Ex. B, ¶ 8 and Tabs 25, 26.) In June, 1996, Dr. Nevarez sent Plaintiff a memorandum in which he directed Plaintiff to "correct this situation immediately and report to me the action taken." (Carr Dep. Ex. 3.)

The court finds that Defendant has proffered a legitimate, nondiscriminatory motive for enforcing the nepotism regulation. Plaintiff claims that this was motivated by ageist animus, but fails to demonstrate pretext. Although there were approximately 125 reported instances of relatives working in the same school system, Plaintiff provides no evidence demonstrating that Dr. Nevarez did not attempt to enforce the nepotism regulation in any of these other cases. Further, Plaintiff provides no evidence that Dr. Nevarez acted other than pursuant to the General Counsel's directive, and Plaintiff provides no evidence that the General Counsel's office acted pursuant to ageist motivations.

Additionally, the court finds that, although Plaintiff construed Dr. Nevarez's June 13, 1996 directive to mean that, if Plaintiff continued to work at DDESS, then his wife would be fired, the evidence demonstrates that Plaintiff had options other than firing his wife. For instance, as noted by Defendant, rather than terminating himself or his wife, Plaintiff could have had his wife request a transfer. (Def.'s Reply at 10.) Indeed, the court

perceives no reason why Plaintiff could not himself have requested a transfer. Although this option might not have been appealing to Plaintiff, constructive discharge would not result even if this were the only option available. "[W]hen an employee resigns rather than accept a transfer for personal reasons, the employee has not been constructively discharged." *Hughes v. Alabama Dep't of Public Safety,* 994 F.Supp. 1395, 1406 (M.D.Ala.), *aff'd,* 166 F.3d 353 (11th Cir.1998).

■ Plaintiff further claims that Dr. Nevarez's decision to preclude Plaintiff from participating in professional activities was predicated on ageist animus. Plaintiff also claims that Dr. Nevarez conducted an investigation into the relationship between SACS and Maxwell DDESS motivated by ageist animus. Subsequent to the investigation, Dr. Nevarez issued a memorandum requiring that Plaintiff, inter alia, take annual leave or obtain Dr. Nevarez's approval for an absence to attend SACS or Committee meetings, conferences, workshops, seminars, or conventions. Defendant demonstrates that Dr. Nevarez was concerned about Plaintiff's participation in SACS and other professional activities for two reasons: (1) that Plaintiff's participation, undertaken at government expense, possibly could take precedence over his primary job as the Maxwell DDESS superintendent, and (2) that the relationship between SACS and Maxwell DDESS could pose a problem from a standard of conduct or ethics standpoint. Defendant contends that no other DDESS superintendent "was even as remotely involved in such activities as [Plaintiff]." (Def.'s Mem. at 13.)

Plaintiff proffers no evidence of pretext. Contrary to Plaintiff's characterization, the evidence demonstrates that Defendant did not preclude Plaintiff from participating in professional activities; rather, Defendant changed the terms of such participation. Plaintiff provides no evidence that the terms of participation were applied other than uniformly, regardless of the person's age.

Plaintiff also contends that "the language of the VSIP [was] more restrictive [than] it had been in the past." (*Id.*) However, uncontroverted evidence demonstrates that the VSIP option was available to all qualifying DDESS employees, and the same language was required to be included in all applications.

■ Finally, Plaintiff claims that Dr. Nevarez developed a reorganization plan to "get rid of [Plaintiff] due to his age" and that he "did not fit" into the plan. (Second Am. Compl. ¶ 13.) As evidence, Plaintiff notes that "the reorganization plan of Dr. Nevarez only affected three states, those with the three oldest superintendents." Further, Plaintiff states that the Fort McClellan DDESS was not included in the plan. Additionally, Plaintiff points out that Dr. Nevarez appointed Dr. Stewart to serve as superintendent of Maxwell DDESS and Fort Rucker DDESS one week prior to Plaintiff's retirement, and Dr. Stewart was younger than Plaintiff.

Uncontroverted evidence demonstrates that the reorganization plan did not include Alabama until late July 1996, subsequent to Plaintiff's mid-July 1996 decision to retire. Further, Defendant contends that the reorganization plan was implemented to save DDESS money. Moreover, Defendant evidences that the Fort McClellan DDESS was not included in the plan because it was already scheduled for closure in June 1999 pursuant to a Congressionally directed base closure. Plaintiff provides no evidence to overcome Defendant's legitimate, nondiscriminatory reason.

While Plaintiff has clearly established that he found his working conditions unpleasant, the court finds that Plaintiff has failed to demonstrate that Defendant's legitimate, nondiscriminatory reasons proffered as motivation for the actions were merely pretextual. Accordingly, the court finds that Defendant's Motion For Summary Judgment is due to be granted.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant's Motion For Summary Judgment be and the same is hereby GRANTED.