Jody L. SHEALY, Ronald H. Rowe, Sr., Ted M. Barton, Richard E. Dudley and Terry Cook, Plaintiffs—Appellees

v.

The CITY OF ALBANY, GEORGIA, A municipal corporation, et al., Defendants—Appellants

No. 1:CV–1200(WDO).

United States District Court, M.D. Georgia, Albany Division.

April 4, 2001.

Eugene C. Black, Jr., Albany, GA, for Plaintiffs.

Al Grieshaber, Jr., Albany, GA, for Defendants.

## ORDER

OWENS, District Judge.

Before the Court are the Plaintiffs' Motion for Damages, Motion for Attorneys' Fees and accompanying memoranda. Defendants have filed several responses to these Motions. After careful review of the extensive record in this case, the Court issues the following Order.

## INTRODUCTION

Plaintiffs are intervenors in this lawsuit that was originally filed in 1972. The original lawsuit was filed under 42 U.S.C. §§ 1981 and 1983. The suit alleged that Defendants had engaged in racial discrimination in hiring and promotional practices. On September 2, 1976, this Court entered a permanent injunction enjoining the City of Albany from discriminatory practices and mandating an affirmative action program to ensure equal employment opportunities for black employees. The Plaintiffs, all of whom are white, intervened in this case in December of 1994 after Henry Fields, Chief of the Albany Fire Department, promoted Arthur Dyer, a black male, to fill the position of Battalion Chief which was being vacated by another black male. Plaintiffs filed a complaint asserting claims of racial discrimination under Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991. Plaintiffs alleged that their qualifications for the position were superior to the candidate who was actually selected. They also claimed they were the victims of reverse discrimination based on the facts surrounding Dyer's promotion. On joint motion of the parties, the Complaint was consolidated with the original class action lawsuit.

On May 22, 1995, an evidentiary hearing was held on Plaintiffs' claims. After hearing testimony from the defendants, this Court found there was no evidence supporting a claim of racial discrimination by the Fire Chief. The court of appeals vacated that ruling in *Shealy v. City of Albany, Ga.*, 89 F.3d 804 (11th Cir.1996) and directed this Court to provide the Plaintiffs with an opportunity to testify regarding their qualifications and to produce evidence of intentional discrimination.

In accordance with the directive of the court of appeals, a non-jury trial was held on June 18, 1997. After hearing extensive testimony from witnesses for all parties, this Court found the Plaintiffs were qualified for and applied for the job of Battalion Chief but were nevertheless rejected for the job which was filled by a black male. Therefore, a prima facie case of reverse discrimination was proven. Further, this Court found that Chief Field's reasons given for his promotion of Dyer rather than Plaintiffs were pretextual and that the actual reason for selecting this candidate was to place a black candidate in what was deemed to be a black position. On June 25, 1997, this Court entered an Order holding that Plaintiffs had shown by a preponderance of the evidence that they had been subjected to racial discrimination under Title VII. *See* Tab 121. The issue of damages was left open to be determined in a later hearing.

On January 21, 1998, this Court awarded Plaintiffs $50,000 each in general damages, exclusive of attorneys' fees and allowable costs. This Court combined actual and compensatory damages into a general compensatory damages award. Defendants filed an appeal of this Order, which the court of appeals dismissed for want of prosecution on August 7, 1998. Defendants then requested the court of appeals to reinstate the appeal and the court did so on October 30, 1998. The Defendants appealed the issues of liability, the amount of damages and the award of attorneys' fees.

On March 10, 2000, the court of appeals entered an Order affirming in part, vacating in part and remanding in part this Court's Order in Plaintiff's favor. The court of appeals affirmed this Court's finding of liability and award of attorneys' fees. The award of compensatory damages was vacated. The matter was otherwise remanded to this Court to determine the appropriate amount of damages consistent with the principles set forth in *United States v. Miami*, 195 F.3d 1292 (11th Cir. 1999). The appeals court found that this Court erroneously awarded compensatory damages. The Court held that the evidence for compensatory damages was "noticeably weak." *Shealy v. City of Albany, Ga.*, 211 F.3d 129, slip op. at 8, n. 4 (11th Cir. Mar. 10, 2000). Accordingly, the court of appeals only addressed the legal principles that govern the award of "make whole" relief or "back pay" damages.

The court of appeals addressed the issue of damages relative to a case such as this where multiple plaintiffs claim to have been discriminated against in relation to only one open position. The court of appeals held that "where the district court cannot determine which of the discriminated against candidates would have received the promotion, then 'make whole' relief should be awarded in a pro rata fashion." *Id.* at 7. "In other words, each of the discriminated against candidates would receive a proportional share of the full monetary value of the promotion for which they were eligible." *Id.* "The total 'make whole' relief awarded should be based on what would have been the actual loss to the single candidate who would have received the promotion if it had been possible to identify him." *Id.* The appeals court then vacated this Court's previous award of $50,000 per Plaintiff and remanded for a

determination of the appropriate amount of damages for the individual Plaintiffs consistent with the principles of *United States v. City of Miami.*

## PART I DAMAGES

### I. Legal Standard for the Award of Damages in this Case

█ The facts of *Miami* involved two civil contempt actions against the City of Miami for 'reverse' racial discrimination in its police officer promotions. *United States v. Miami*, 195 F.3d 1292 (11th Cir. 1999), *cert. denied,* — U.S.——, 121 S.Ct. 52, 148 L.Ed.2d 20 (U.S.2000). The district court found that the city's " 'special certification' [1] of black officers as promotion candidates resulted in the unlawful promotion of one black lieutenant and one black sergeant." *Id.* at 1294. The court found the city in civil contempt of the 1977 consent decree. The court awarded "broad 'make-whole' relief to all 'adversely affected' police officers, as if each of these officers actually would have received one of the two promotions in 1992." *Id.* The plaintiffs were awarded "full backpay, retroactive seniority, a fifteen thousand dollar lump-sum pension payment, and a one rank promotion from their current positions." *Id.* at 1298. The court of appeals found "the district court's chosen remedy was excessive and that it should have divided the monetary value of the two promotions on a pro rata basis amongst the class of eligible candidates." *Id.* at 1294.

The court restated a previous holding that " 'make-whole' relief is intended to recreate employment conditions that would have existed absent an employer's discrimination—i.e., to place 'the injured party in the position he or she would have been in absent the discriminatory actions.' " *Id.* at 1298 (citation omitted). The court stated this holding "draws support from the Supreme Court's conclusion in [other cases] that Title VII 'provides make-whole relief only to those who have been actual victims of illegal discrimination.' " *Id.* (citation omitted). The court of appeals found that the only officers actually harmed by discriminatory practices were those who were eligible for the promotions during the period in question.

The court stated that, in determining equitable remedies in cases like this one, district courts enjoy "wide discretion" to fashion a remedy "for civil contempt that is appropriate to the circumstances." *Id.* Awards of this nature serve one of "two broad purposes: (1) coercing the contemnor to comply with a court order, or (2) compensating a party for losses suffered as a result of the contemptuous act." *Id.* (citation omitted). The court's power in these matters "is measured solely by the 'requirements of full remedial relief.' " *Id.* (citation omitted). The district courts may not, however, use this power to "impose what amounts to a punitive or criminal contempt sanction." *Id.* (citation omitted). The appeals court found that the district court's "unfair and sweeping" award to the Plaintiffs amounted to a "windfall to the officer class and an abuse of the district court's discretion to award remedial relief." *Id.* at 1301.

---

1. The process for certification first began by eight candidates who were chosen in rank order from the results of a promotional exam. The Director had the discretion to certify three minority officers by exam-rank order. For each additional vacancy, two candidates were added to the certified pool: the officer with the next highest overall test score and the minority officer with the next highest test score. The Director further had the discretion to certify up to three additional candidates if special requirements of sex or domicile were involved, or additional 'special qualifications' were required at the time. All of the candidates must have scored high enough on the promotional exam to satisfy the city's eligibility requirements. *Miami,* 195 F.3d at 1295.

To avoid a windfall to successful plaintiffs in these types of cases, the district court should attempt to "recreate the conditions and relationships that would have been had there been no 'unlawful discrimination.'" *Id.* at 1299. The district court is to attempt to discern how the promotions *"likely* would have proceeded in the absence of the discriminatory 'special certification' procedures implemented by the City" as in the *Miami* case. *Id.* (emphasis in original). The court of appeals acknowledged that this process can be wrought with uncertainties in the relief process, but those uncertainties "should be resolved against the discriminating employer." *Id.* "[A]t the same time, ... classwide remedies must strive for equity to both parties." *Id.* The "key is to avoid both granting a windfall to the class at the employer's expense and the unfair exclusion of claimants by defining the class too narrowly." *Id.* at 1299, 1300 (citation omitted). The appeals court found that the district court's remedy was excessive because it treated each individual plaintiff "as if he had a one hundred percent probability of receiving a promotion absent the City's discrimination." *Id.* at 1300. Each plaintiff received "the full value of a 1992 promotion including backpay, retroactive seniority, a fifteen thousand dollar pension payment, and a one rank promotion from their current position." *Id.* However, "each lieutenant candidate stood only a one in twenty-three (or four percent) chance of promotion, and each sergeant candidate stood only a one in twelve (or eight percent) chance of promotion." *Id.* The "estimated monetary value of the two lost promotions [was] only a little over five hundred thousand dollars." *Id.* at 1301. The estimated costs of the district court's award, however, was around nine million dollars. *See Id.*

The court found the district court should have relied on a variant of the pro rata method for computing classwide remedial relief. "This computation method awards each class member a *proportional* share of the full monetary value of the promotion for which they were eligible." *Id.* (emphasis in original). In *Miami,* the court found that "each certified sergeant candidate not selected for the promotion would receive a one-twelfth share; while each certified lieutenant candidate not selected for the promotion would receive a one-twenty-third share." *Id.* This is the appropriate method for determining a remedy "when, even after reasonable effort, a court is unable to differentiate between class members for remedial relief purposes." *Id.* (citation omitted). By following this decision-making process, a court balances the "twin duties to fairly compensate discrimination victims and yet avoid punitive remedial relief awards." *Id.* at 1301. This is the process by which damages will be awarded to Plaintiffs in the case at bar.

## II. Introduction to Back Pay and Front Pay

In *Nord v. United States Steel Corp.,* the Eleventh Circuit Court of Appeals held that the back pay period extends until the date of judgment. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1473 (11th Cir. 1985) (citation omitted). That is, back pay begins at the time of the discriminatory employment action and runs through the date judgement is entered in a plaintiff's favor. However, when an employee voluntarily quits his job, the employer's liability for backpay usually ends. In order to be eligible for back pay after one leaves their employer, the employee must prove that he or she was 'constructively discharged.' *Morrison v. Genuine Parts Co.,* 828 F.2d 708, 709 (11th Cir.1987) (citing *Wardwell v. School Bd. of Palm Beach County,* 786 F.2d 1554 (11th Cir.1986) (holding that mere failure to promote is not sufficient to support a finding of constructive discharge)). Along with back pay, "Title VII

plaintiffs are presumptively entitled to either reinstatement or front pay." *Shealy,* slip op. at 6.

In this particular case with multiple plaintiffs vying for one position the standard is that "each of the discriminated against candidates [should] receive a proportional share of the full monetary value of the promotion for which they were eligible." *Shealy,* slip op. at 7. "The total 'make whole' relief awarded should be based on what would have been the actual loss to the single candidate who would have received the promotion if it had been possible to identify him." *Id.* In this case, the promotion would have been worth vastly different amounts to each individual Plaintiff because of their differences in pay rates, seniority and other factors.

Defendants have not submitted any rebuttal evidence in their Response in Opposition to Plaintiffs' Motion for Damages for Plaintiffs Barton, Rowe, Dudley and Cook. Defendants rely merely on their arguments that these particular Plaintiffs are not entitled to any damages. Defendants contend the only Plaintiff entitled to a damages award is Jody Shealy because they disagree with the application of the *Miami* principle discussed above. Accordingly, the damages for Rowe, Barton, Dudley and Cook will be calculated based upon evidence submitted by each individual Plaintiff. All of these calculations are made in deference to the standard from the *Miami* case suggesting that any ambiguities in amounts regarding damages should be construed *against* the discriminating employer. *Miami,* 195 F.3d at 1299.

Following the principle of placing plaintiffs in the position they would have been in absent discriminatory hiring practices, the Plaintiffs in this case will be awarded back pay and front pay. However, pursuant to the directive of the court of appeals, this award will only represent ⅕ or 20% of the value of the promotion to the individual plaintiff. *Id.* at 1301. The award is calculated in this manner because there are five plaintiffs in this action who sued regarding one open employment position. It is impossible from the facts of this case to determine which one of the five would have been chosen for Battalion Chief absent discrimination. Accordingly, each Plaintiff's damages are based on the percentage of the chance each had to obtain the promotion to Battalion Chief. Before the damages are calculated, it must be explained why the Plaintiffs are not eligible for a finding of constructive discharge enabling them to receive the full amount of front pay requested.

### III. Caselaw Setting the Standard for Determining Constructive Discharge

■ "The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation," the employee is constructively discharged. *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980).[2] The test is not a strict one of, "Are the imposition of intolerable working conditions carried out with the purpose of forcing the employee to resign?" *Id.* (citation omitted). The test is, "to find constructive discharge we believe 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* (citation omitted).

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In *Wardwell v. School Bd. of Palm Beach County, Fla.,* the court of appeals held, "[t]o show constructive discharge, the employee must prove that his working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Bd. of Palm Beach County, Fla.,* 786 F.2d at 1557 (citation omitted). In *Wardwell,* a female employee brought a Title VII suit against a school board and superintendent. She alleged defendants wrongfully denied her a promotion to the position of Acting Director of Transportation for the school system and that she was constructively discharged from her position as Assistant Director of Transportation. *Id.* at 1554. The factors asserted by plaintiff which she stated supported a finding of constructive discharge were: (1) the plaintiff was qualified for the job actually given to a man (Goode); (2) the plaintiff was given an inadequate explanation for the personnel decision; (3) the refusal to promote was allegedly discriminatory; and (4) plaintiff was overburdened with work after Goode was appointed to the position of Acting Director.[3] *Id.* at 1557. The court found that although plaintiff "may have been frustrated by her failure to be appointed Acting Director, and while this may have been a matter of some embarrassment to her, these facts, together with her added workload, simply do not rise to the intolerable level at which a reasonable person would feel compelled to resign." *Id.* at 1558. The court held there was no evidence to support a finding that the board's failure to promote plaintiff was the result of intentional discrimination. *Id.* Further, the Court held there was no evidence to support a finding of constructive discharge. *Id.*

Another case stated "a constructive discharge cannot be based upon the employ-ee's subjective preference for one position over another." *Hughes v. Alabama Dep't of Pub. Safety,* 994 F.Supp. 1395, 1405 (M.D.Ala.1998) (citation omitted). In *Hughes,* the plaintiff was asked to transfer from a city where he and his family had lived for 22 and a half years. *Id.* The court found no constructive discharge in that case because there was no evidence that working conditions in the new city were so horrendous as to be intolerable. *Id.*

To support a finding of constructive discharge, the Eleventh Circuit Court of Appeals has "traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'" *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir.1991) (citation omitted). In *Hill,* there was a dispute between the employee-plaintiff and the employer-defendant over time spent performing jury duty and the time spent after jury duty concluded for the day. Winn–Dixie claimed that Hill failed to report to work in the evening after jury duty and failed to cover her department. Notwithstanding the holding of the court of appeals that Winn–Dixie violated other unrelated statutes, the court found there was no evidence of constructive discharge. The court entered this finding even though the evidence showed there was a formal written reprimand, criticism by Hill's supervisors in the few weeks following her jury service, and the withdrawal of customary support of the produce department. *Id.*

■ The front pay awarded to plaintiffs in the case at bar is a substitute for them being unable to find a "substantially equivalent position" in another field of work relative to that of a firefighter offi-

---

**3.** The court found that the "extra burden was in part the result of Goode's inexperience with transportation matters and in part due to [plaintiff's] already heavy workload." *Id.*

cer. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1529 (11th Cir.1991). "A monetary award of front pay is calculated to terminate on the date a victim of a discrimination attains an opportunity to move to his 'rightful place.'" *Id.* (citing *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 358 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978)). "Front pay, therefore, is appropriate only when the other damages awarded will not fully compensate the plaintiff for his injury." *Id.* (citation omitted). Front pay is also awarded when reinstatement to a position is not possible. *Nord v. United States Steel Corp.*, 758 F.2d at 1473 (citation omitted). Even though reinstatement is not at issue in the case at bar because there was no discriminatory discharge, front pay will be awarded based on the Defendants' discriminatory failure to promote one of the five Plaintiffs. The precise amount of damages to which each Plaintiff is entitled differs based on the different employment status of each individual at the time of the discrimination.

## IV. Method for Calculating Damages

### A. Interest Allowable

■ Pre-judgment and post-judgment interest is also awarded in this case and must be added by the Defendants to the award for each Plaintiff. The appropriate rates of interest for the different time periods are found in the table following 28 U.S.C. § 1961 as set out in the 2000 edition of the Federal Rules of Civil Procedure. Pre-judgment interest is to be awarded from March 19, 1994, through the date of judgment finding liability—June 25, 1997. Pursuant to the mandate of the Supreme Court of the United States, post-judgment interest is only available from the date this Order is made the Judgment of the Court until the time all damages are paid in full. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Post-judgment interest should only be awarded from the date of a judgment in which damages were ascertained in a meaningful way. *Id.* In this case, that date is the date this Order is made the Judgment of the Court as this Court's previous finding of damages was reversed by the court of appeals.

### B. Reduction to Present Value

■ In determining damages, any amounts representing future damages must be reduced to present value pursuant to mandates from both the Supreme Court and the Eleventh Circuit Court of Appeals. *See Monessen S.R. Co. v. Morgan*, 486 U.S. 330, 339, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988); *Deakle v. John E. Graham & Sons*, 756 F.2d 821 (11th Cir.1985). "The present value is defined as how much a sum of money received in the future is worth now." Research and Planning Consultants, Inc. (RPC), *Economic Damages to Plaintiff*, April 15, 1999, at 11.[4] "Present value takes into account the time value of money: one dollar received today is worth more than one dollar received in the future." *Id.* "The present value is determined by the rate of discount, or interest rate, and the amount of time for which it is being discounted." *Id.* There are several different methods for calculating the present value of a future award. For the Eleventh Circuit, the correct method utilizes what is known as the "below market

---

**4.** RPC was retained by an attorney to provide an analysis of economic damages. In this material, the individuals preparing the summary took into account many factors of economic loss in relation to a personal injury claim. However, their analysis produced a clear, succinct explanation for present value calculations. *See also* Mattew, Bender, *Damages in Tort Actions*, v. 9, § 108.12 (1997).

discount rate" applied to the current award of damages. *Deakle,* 756 F.2d at 832. "The rate represents the estimated market interest rate that [Plaintiffs would] earn on the monies received after final judgment, adjusted for the effect of income taxes [they] will pay on the interest and then offset by the expected rate of general wage and price inflation." *Id.* (citation omitted).[5]

A widely accepted method of determining the below market discount rate is by subtracting the average annual change in the Consumer Price Index over a period of years from the annual interest rate on government bonds held during the same period. Matthew, Bender, *Damages in Tort Actions,* v. 4, § 38.22[3] (1997). There is no set period of years to use to determine this figure. For the awards in this case, the years 1994 through 2000 were considered as that amount of time should represent a broad historical economic perspective relative to this case. The calculations for these figures were obtained from the web pages of the Bureau of Labor Statistics [6] and the Federal Reserve.[7] The exact figures used to determine the below market discount rate is set forth fully in Appendix I.

The court of appeals has explained that the calculation to reduce future awards to present value must be performed by dividing the present amount of each individuals' award which represents future damages by the proposed life expectancy to reach a constant stream of annual installments. Thus, the first installment will be discounted for only one year, the second for two years, the third for three years, and so on.

The discounted installments will then be added together to reach the sum finally awarded as lost future retirement benefits. To apply the discount rate to the entire award as a whole would be erroneous, since the goal is not to award each Plaintiff an amount of money at the time of judgment that, together with future interest, would have equaled the total damage amount at the end of the Plaintiff's expected life span. Rather, the goal is to award a sum that, when invested, would enable the Plaintiff to withdraw a certain amount each year for the rest of his expected life span. *Id.*

In this case, the dollar amounts of the future awards were calculated based on the dates of retirement through each Plaintiffs' individual life expectancy. Further, any amount of retirement benefits that should have already been paid represent back pay and will be deducted from amounts to be paid in the future. Only those amounts actually representing amounts to be paid from the date of this Order forward are discounted to present value. The precise dollar amounts and calculations are found at the end of this Order in Appendixes II—IV.

## C. Damages for Each Individual Plaintiff

### 1. Plaintiff Jody Shealy

Applying the foregoing standards to the facts of the case at bar, there is no evidence of constructive discharge for Plaintiff Jody Shealy who left the employment of the City of Albany after Dyer was promoted to Battalion Chief. Rather, the

---

5.  The precise formula for this calculation is: $PV = x/(1 + i)^n$ where PV represents present value; $x$ represents the amount of money to be awarded; $i$ represents the interest or discount rate; and $n$ represents the number of periods or years in the future. This formula must be applied to each year separately rather than applied to the damages award as a whole.

6.  At http://stats.bls.gov/bls_news/archives/cpi_nr.htm.

7.  At http://www.federalreserve.gov/releases/h15/data/a/tcm5y.txt.

evidence supports a finding that he voluntarily quit working for the fire department. During Shealy's direct examination during the trial of this case, he was asked, "Why did you leave the Albany Department?" *See* Trial Tr. at 134. Shealy responded

I felt like my career was over with. I felt like that I was a victim of racial discrimination. I felt like that I was deprived of the opportunity to compete for the position that I had sought my total career and prepared myself for my total career and I thought that I was frankly on a deadend street because of the activities that [had] taken place on a day-to-day basis.

*Id.* Dyer was promoted to Battalion Chief on March 19, 1994. Shealy did not leave the fire department until September 1, 1996. The conditions after March, 1994 were obviously not so intolerable that he could not stay with the department for two and a half more years. When asked whether he was forced to leave, he responded, "Absolutely not, Your Honor. I contend that my future expectations were greatly hampered due to discriminatory practices." *Id.* at 135. He further stated when asked directly whether he voluntarily left the department, "That's correct, I voluntarily sought employment elsewhere because of the working conditions." *Id.* at

144. This testimony at first glance may seem to indicate that working conditions were intolerable. However, in light of the fact that Shealy stayed with the department for two and a half years after he was denied the promotion, there is no evidence of constructive discharge. The testimony reflects that Shealy, like the plaintiff in *Wardwell*, was merely frustrated by his failure to be promoted. There is no support that the working conditions were so unpleasant or intolerable that a reasonable person would have been forced to resign. Therefore, the eligibility for backpay for Jody Shealy ended at the time he voluntarily left the fire department and went to work elsewhere. As Shealy left the department prior to the date of judgment in this case, he is also not entitled to any front pay reflecting future wages or future fringe benefits.

▮ Shealy submitted a very detailed exhibit with his Motion for Damages. In that exhibit is a comparison of his salary while he remained working for the fire department and what his salary would have been had he been promoted to Battalion Chief. The table below represents the salary differential between the two different ranks up until his last day working for the department. The difference in the two amounts is listed in parentheses [8].

| ANNUAL SALARY AS CAPTAIN FOR THE FOLLOWING PERIODS | | SALARY AS BATTALION CHIEF FOR THE SAME PERIODS |
|---|---|---|
| 2/22/94–8/22/94 | 36,429.12 | 38,263.68 (Diff: 1,834.56) |
| 8/22/94–6/30/95 | 36,429.12 | 40,214.72 (Diff: 3,785.60) |

**8.** As Plaintiffs and Defendants calculated the damages amounts differently regarding the applicable time periods and amounts to be awarded, a reasonable combination of the two different calculations was used to determine the appropriate amount of back pay. However, inconsistencies in the amounts are construed against the Defendants. *See Miami, supra.* For instance, Plaintiff Shealy calculated his back and front pay only up through June 30, 1997. However, he voluntarily quit working for the fire department on September 3, 1996. The difference is figured into the calculation. The final amounts in his and every other calculation also represents the ⅕ or 20% figure pursuant to the order of the court of appeals.

| 7/1/95–6/30/96 | 37,477.44 | 42,427.84 (Diff: 4,950.40) |
| 7/1/96–9/1/96 | 38,662.62 | 43,761.54 (Diff: 5,098.92) |

TOTAL DIFFERENCE IN SALARIES $ 15,669.48

**TOTAL AMOUNT OF DAMAGES**

**$15,669.48 × ⅕ = $3,133.90 plus the appropriate rate of interest.**

---

### 2. Plaintiff Ted Barton

The same findings regarding constructive discharge apply equally to Plaintiff Ted Barton. His testimony at the non-jury trial and the post-trial hearing indicate he voluntarily quit working for the fire department for the same reasons indicated by Shealy. There seemed to be little dispute about the voluntariness of Barton's decision to leave the department. He was asked by Defendants' counsel, "Captain Barton ... when did you voluntarily retire from the City of Albany?" *See* Trial Tr. at 119. Barton responded, "I believe it was effective the tenth month of '96." *Id.* Barton was asked on direct examination, "Why did you leave the Albany Fire Department?" *See* Tr. at 60. He responded, "I felt like my career had ended since I didn't have the opportunity to compete for the Battalion Chief's position." *Id.* at 61. He was again asked on cross-examination, "And you voluntarily resigned from the Albany Fire Department?" *Id.* at 71. Barton responded,

That's true. I voluntarily left the Fire Department after filing a grievance on harassment of Chief Fields which went through the City Manager, and you was present, and the grievance went unanswered. Four to five of the ten that was enumerated were answered and this was

**Back Pay for the following periods:**

a year before I had terminated my employment with the City, and the realization hit me that I could no longer be promoted. I had reached the top of where I was going to go. As long as Chief Fields was in office, he would not ever promote me and it became obvious that I needed to seek employment elsewhere, so I did seek employment elsewhere and I started out at entry level position.

*Id.* at 72. This testimony reflects, as did Shealy's, merely a *dissatisfaction* with his employment. There is no indication that Chief Fields or anyone else made the working conditions at the fire department so intolerable that a reasonable person would have felt compelled to resign. Rather, the testimony from the witnesses evidences mere discontent among those not chosen for the promotion. Accordingly, Ted Barton's back pay will be calculated based on the documentary and testimonial evidence submitted up until this point and will end at the point when he voluntarily quit working for the fire department. For the same reasons articulated above regarding Shealy, Barton is not entitled to any front pay damages. As Defendant has failed to submit additional information refuting the amounts requested, what follows represents the difference in his salary as it was when he left and what his salary would have been had he been promoted.

| | |
|---|---|
| February 1994—1995 | $ 3,875.69 |
| February 1995—1996 | 5,360.00 |
| February 1996—Oct. 1996 | 5,192.81 |
| | $14,428.50 |
| Mileage Expenses | $591.25 (2365 miles × .25) [9] |

**TOTAL AMOUNT OF BACK PAY $15,019.75**

**TOTAL AMOUNT OF DAMAGES:**

**$15,019.75 × ⅕ = $3,003.95 plus the appropriate rate of interest**

---

### 3. *Plaintiff Ronald Rowe*

■ Plaintiff Rowe retired from the fire department on January 22, 1999. Rowe submitted a less detailed affidavit than the other Plaintiffs in support of his request for damages. Therefore, his damage computations are not as complicated and explicit as listed above. As the Defendants have provided no rebuttal documentary evidence refuting the figures provided by Rowe, the adjusted figures filed with this Court on February 19, 2001 [10] will be used to determine his back pay and front pay damages through the date he retired in January 1999.

| TIME PERIOD | CAPTAIN PAY | BATT. CHIEF PAY | DIFFERENCE |
|---|---|---|---|
| 1994 | $ 33,720 | $ 36,677 | $ 2,957 |
| 1995 | 34,564 | 38,534 | 3,970 |
| 1996 | 36,663 | 39,500 | 2,837 |
| 1997 | 37,599 | 40,498 | 2,899 |
| 1998 | 40,534 | 44,530 | 3,966 |
| **TOTAL** | **$183,030** | **$199,739** | **$16,629** |

---

The amount of retirement differential is $46,153. This figure represents the difference in the amount of retirement Plaintiff is now receiving and what he would have

9. This Plaintiff is the only one who figured in a mileage amount as a part of the back pay calculation.

10. These latest figures were provided by Plaintiff's attorney after a request by this Court to more fully describe and support the damages sought by this Plaintiff. The figures are represented in table form with an accompanying affidavit from Plaintiff himself verifying the accuracy of the figures represented. Defendants have not provided alternate figures at this point, thus the figures provided by Plaintiff are relied upon by the Court as accurately reflecting the appropriate amount of damages.

received if he would have retired as a Battalion Chief.

The amount representing any future award must be reduced to present value. The amounts representing the differential for years in which he has already received retirement benefits, 1999—2001, will not be reduced as that represents back pay. However, the amounts for years 2002—2018 will be reduced to present value. The retirement differential is $46,153. As directed by case law, this amount was divided by 20 to represent the 20 years over which this award will be allotted based on Rowe's life expectancy. That amounts to a difference of $2,307.65 per year. For 1999 through 2001, Plaintiff Rowe is to be paid the full amount. For the years 2002–2018, the amounts will be discounted by applying the formula set out above. For example, for year 2002, the formula reads as follows: $PV = \$2,307.65/(1 + 3.49\%)^4$. This formula produces the amount of $ 2,011.76. This calculation was performed for each year and is represented in full in the Appendixes following this Order.

**TOTAL RETIREMENT AMOUNT REDUCED TO PRESENT VALUE**      **$33,013.46**

---

The amount listed for the difference in sick pay and vacation benefits is $1,922. In the spirit of attempting to make the Plaintiff whole for the discriminatory conduct in this case, this amount will be awarded although the specific period of time for which this amount applies was not listed. However, the method of calculation was provided in detail by Plaintiff Terry Cook as seen below.

| | |
|---|---:|
| **TOTAL VACATION AND SICK PAY BENEFITS** | **$ 1,922** |
|     BACK PAY and FRONT PAY AWARD | $16,669 |
|     RETIREMENT AWARD | $33,013.46 |
|     FRINGE BENEFITS AWARD | $ 1,922 |
| | |
| SUBTOTAL | $51,604.46 |
| | |
| $51,604.46 divided by 5 =         **TOTAL** | $10,320.89 |

---

### 4. *Plaintiff Terry Cook*

Plaintiff Cook retired from the fire department on January 15, 2001. His damages will be computed through that date to include back pay and the retirement differential with the future amounts reduced to present value using the same formula used above for Plaintiff Rowe.

| TIME PERIOD | CAPTAIN PAY | BATT CHIEF PAY | DIFFERENCE |
|---|---|---|---|
| 1994 | $ 30,122.64 | $ 32,312.24 | $ 2,189.60 |
| 1995 | 32,374.80 | 34,720.80 | 2,346.00 |
| 1996 | 34,994.22 | 37,509.28 | 2,515.06 |
| 1997 | 37,949.36 | 44,792.96 | 6,843.60 |
| 1998 | 40,570.16 | 48,139.92 | 7,569.76 |

| | | | |
|---|---|---|---|
| 1999 | 42,600.64 | 50,546.24 | 7,945.60 |
| 2000 | 45,809.44 | 54,335.68 | 8,526.24 |
| 2001 | 2,448.92 | 2,904.72 | 455.80 |
| **TOTAL** | **$266,870.18** | **$305,261.84** | **$38,391.66** |

The amount of retirement differential is $81,822. This figure represents the difference in the amount of retirement Plaintiff is now receiving and what he would have received if he would have retired as a Battalion Chief.

**TOTAL RETIREMENT AMOUNT REDUCED TO PRESENT VALUE** $51,044.31

The amount listed for the difference in sick pay and vacation benefits is $4,150. This amount is paid to retiring firefighter officers who retires with over twenty years experience. They automatically receive 1,008 hours of sick pay upon retirement. The number of hours, 1008, is multiplied by the hourly rate the officer was making immediately prior to the date of retirement which in this case is a difference of $2,875.00. The vacation pay is paid in the form of accumulated time multiplied by the hourly rate of the officer which in this case represents a difference of $1,275.00.

| | |
|---|---|
| **TOTAL VACATION AND SICK PAY BENEFITS** | $4,150 |
| **BACK PAY and FRONT PAY AWARD** | $ 38,391.66 |
| **RETIREMENT AWARD** | $ 51,044.31 |
| **VACATION AND SICK PAY AWARD** | $ 4,150.00 |
| **SUBTOTAL** | $ 93,585.97 |

$ 93,585.97 divided by 5 = **TOTAL** $ 18,717.19

### 5. *Plaintiff Ricky Dudley*

██ As of the latest information received from Plaintiffs' attorney, there is no evidence Ricky Dudley has left the fire department. Accordingly, his damages are computed based on back pay up until the date of judgment. He is awarded front pay damages based on what he would have made as a Battalion Chief and the accompanying retirement benefits. Defendants have not presented any rebuttal documentary evidence to Dudley's calculations.

| ANNUAL SALARY AS CAPTAIN FOR THE FOLLOWING PERIODS | | SALARY AS BATTALION CHIEF FOR THE SAME PERIODS |
|---|---|---|
| 2/22/94–8/22/94 | 36,429.12 | 38,263.68 (Diff:  1,834.56) |
| 8/22/94–6/30/95 | 36,429.12 | 40,214.72 (Diff:  3,785.60) |
| 7/1/95–6/30/96 | 37,477.44 | 42,427.84 (Diff:  4,950.40) |
| 7/1/96–6/30/97 | 38,662.62 | 43,761.54 (Diff:  5,098.92) |

**TOTAL AMOUNT OF BACK PAY— $ 15,669.48**

Below is a table which represents the amount of front pay due Dudley based on his projected salary from 7/1/97—1/1/02. This time period is calculated based upon his completion of 30 years of service with the fire department and his planned date of retirement. The figures are also based on a 3% cost of living raise per year plus a 4% raise on 1/1/98 as was reported by the city manager in the Albany Herald.

| TIME PERIODS | SALARY AS CAPTAIN | SALARY AS BATTALION CHIEF |
|---|---|---|
| 7/1/97–12/31/97 | 38,822.50 | 45,074.38 (Diff. 6,251.88) |
| 1/1/98–6/30/98 | 41,429.61 | 46,880.87 (Diff. 5,451.26) |
| 7/1/98–6/30/99 | 42,680.89 | 48,289.70 (Diff. 5,608.81) |
| 7/1/99–6/30/00 | 43,971.20 | 49,729.39 (Diff. 5,758.19) |
| 7/1/00–6/30/01 | 45,290.34 | 51,229.07 (Diff. 5,938.73) |
| 7/1/01–1/1/02 | 46,640.05 | 52,758.74 (Diff. 6,118.69) |

| | | |
|---|---|---|
| TOTAL AMOUNT OF FRONT PAY FROM 7/1/97–1/1/02 | = | $35,127.56 |
| TOTAL AMOUNT OF BACK PAY FROM 2/22/94–6/30/97 | = | $15,669.48 |
| COMBINED TOTAL | = | $50,797.04 |

The following is a table for a thirty-year retirement based on 1.75% per year of the average of your three highest years of the last five years of service. The estimated lifetime retirement payment calculation was based on the life expectancy of seventy-six years. Dudley will be 56 years old upon his expected retirement of January 1, 2002. The difference in retirement payments between the positions of Captain and Battalion Chief reduced to present value is as follows:

|  | CAPTAIN | BATT. CHIEF |
|---|---|---|
| Average | 45,300.53 | 51,239.07 |
| Annual Retirement | 23,782.78 | 26,900.51 |
| TOTAL | 475,655.60 | 538,010.20 |

**DIFFERENCE =** $62,354.60 which reduced to present value is $38,275.63.

Retirement Difference = $38,275.63
Salary Difference = $39,908.02

TOTAL = $78,183.65

**TOTAL AMOUNT OF DAMAGES—**
$78,183.65 × ½ = $15,636.73

---

## PART II   ATTORNEYS FEES

### I.   Reasonable Hourly Rate

█ In determining an award of attorney's fees, the Court must initially calculate the "lodestar" by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Loranger v. Stierheim,* 10 F.3d 776 (11th Cir.1994). "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Id.* at 81 (citing *Blum v. Stenson,* 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 896 (1984)). The party seeking attorney's fees must provide evidence, other than the affidavit of the attorney performing the work, that the requested rate conforms with the prevailing market rate. *Loranger,* 10 F.3d at 776.

Plaintiffs' attorneys seek the following amounts of compensation: (1) for attorney Eugene Black—$175 per hour; (2) for attorney Michael Custer—$100 per hour; and (3) for intern Gail Drake—$75 per hour. After several submissions, the attorneys have submitted sufficient support for these rates. The attorneys submitted the affidavit of Mr. Howard Stiller, an attorney who practices in Albany. Stiller stated in this affidavit that he has experience in civil rights litigation and the hourly rates of civil rights litigators in the Albany area. This affidavit supports the attorneys' request for the above rates. In light of defense counsel's objections to the rates requested [11], this Court considered the skill and experience of counsel; whether the rates fall within the appropriate range of available rates; and any special circumstances that might apply. *See Norman v. Housing Montgomery Auth.,* 836 F.2d 1292 (11th Cir.1988).

11. One of Defendants' attorneys submitted an affidavit stating he thought the current rate for Eugene Black should be only $150 per hour and that the rate for the intern should only be $60 per hour. The Defendants' attorneys also took issue with Mr. Black providing no evidence supporting his $175 per hour request. However, since Defendants' objections and at this Court's instruction, Mr. Black has submitted the affidavit of Mr. Stiller.

The affidavit provided by Howard Stiller provides evidence of many of these factors and others necessary to determine the appropriate rate of fees in this case. Specifically, his affidavit provided evidence of the customary fees in the Albany area for the two attorneys and one intern involved in this case. His affidavit also provided a legal opinion on the novelty and difficulty of the issues, time limitations and preclusion of other employment in a case like this one. This factor is especially important in this particular case as the substantive law changed during the pendency of this case. The Eleventh Circuit Court of Appeals handed down the *Miami* decision, regarding the appropriate method of computing damages in this case, after the original decision was handed down by this Court. The later decision by the court of appeals required the Plaintiffs' attorneys to address an entirely new area of substantive law in the middle of their case. In light of the difficulties of this case, there is more than sufficient evidence to award the rate requested by Plaintiffs for attorney's fees.

Another factor considered when determining the proper attorney fee amount is the undesirability of the case which is readily apparent in this case. "In general, civil rights litigation is seen 'as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer.'" *James v. City of Montgomery*, 1995 WL 271138, *3 (M.D.Ala. Apr. 19, 1995) (citing *Stokes v. City of Montgomery*, 706 F.Supp. 811, 815 (M.D.Ala.1988)), *aff'd*, 891 F.2d 905 (11th Cir.1989).

In light of the above case law applied to the facts of the case at bar, the rates requested by the attorneys in this case are more than reasonable. Accordingly, the award will be calculated based on the amounts listed in their motions: $175 for attorney Eugene Black; $100 for attorney Michael Custer and $75 for intern Gail Drake.

## II. Reasonable Number of Compensable Hours

The next step is to compute the number of hours reasonably expended in this matter. Excessive, redundant, or otherwise unnecessary hours should be excluded from the amount claimed. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Thus, fee applicants are required to use "billing judgment." *Id.* at 437, 103 S.Ct. 1933. The excluded hours are those which are unreasonable to bill to a client "irrespective of the skill, reputation or experience of counsel." *Norman*, 836 F.2d at 1301. Generalized statements that the time spent was reasonable or unreasonable, are not particularly helpful and are entitled to little weight. *See Hensley*, 461 U.S. at 439 n. 15, 103 S.Ct. 1933. "The general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. Furthermore, "as the district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should be the objections and proof from fee opponents." *Norman*, 836 F.2d at 1301.

To avoid awarding redundant fees to multiple attorneys, the district court must find that the requesting attorneys

satisfie[d] [their] burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multi-lawyer litigation. But the fee applicant has the burden of showing that, and where there is an

objection raising the point, it is not a make-believe burden.

*ACLU of Georgia v. Barnes,* 168 F.3d 423, 432 (11th Cir.1999).

In addition to deducting excessive, redundant and unnecessary hours, the district court must also deduct for time spent on unsuccessful claims. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. However, unless the fee applicant obtained only limited success, where the successful and unsuccessful claims involved related legal theories, no fees should be deducted. *See Id.* at 424, 103 S.Ct. 1933; *Avila v. Coca-Cola Co.,* 849 F.2d 511, 514 (11th Cir.1988).

> Time spent pursuing unsuccessful claims that were clearly without merit should be excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that time spent pursuing these claims should automatically be disallowed .... Instead the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case.

*Freeman v. Motor Convoy, Inc.,* 700 F.2d 1339, 1356 (11th Cir.1983) (citing *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir. 1981)). Further, "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Mallory v. Harkness,* 923 F.Supp. 1546, 1554 (S.D.Fla.1996) (citing *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933). "Where a plaintiff has obtained the result sought, courts should award full attorney's fees and are directed not to reduce fees awarded to account for failed contentions raised in the lawsuit." *Id.*

Plaintiffs' attorneys have submitted records of all work done in this case, totaling 126.1 attorney hours and 18.5 intern hours. Defendants object to many of the billed hours based on the following grounds: (1) excessiveness, (2) redundancy, (3) time devoted to unsuccessful damages arguments on appeal, and (4) non-compensable travel time. Since these objections were made by Defendants, Plaintiffs' attorneys have now submitted very detailed records of all work done in the case. After thoroughly and exhaustively reviewing the three submissions by Plaintiffs' attorneys, the Court finds: (1) that no particular time entry was excessive given the nature and relative complexity of this case, (2) that the time spent on certain unsuccessful arguments on appeal should not be deducted as they related to the types of damages allowed in this case and not the substantive claim of discrimination on which Plaintiffs have clearly been successful, (3) the amount of time requested for travel is reasonable, and (4) there does not appear to be any redundancy considering the complexity of this case and the many substantive twists and turns the case has taken in this many years.

Regarding the arguments made on appeal, Plaintiffs actually did succeed in that they were awarded attorneys fees and damages with a remand to this Court to determine the appropriate amounts. As far as the petition for rehearing on the damages issue, this was not a frivolous argument and was inextricably related to the heart of this case—employment discrimination. As directed by case law, this Court considered whether the arguments on appeal logically flowed or related to the primary issues and the objectives of this suit.[12] In this case, they do.

Defendants also argue that many of the hours for which Plaintiffs seek in attor-

---

12. *Williams v. Fairburn,* 702 F.2d 973, 977 (11th Cir.1983).

ney's fees for Michael Custer represent redundancy and lack of billing judgment. A recent court of appeals opinion stated "there is nothing inherently unreasonable about a client having multiple attorneys." *ACLU of Georgia v. Barnes*, 168 F.3d at 432 (citing *Norman*, 836 F.2d at 1302). A court should only reduce hours for redundancy "if the attorneys are unreasonably doing the same work." *Id.* "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* (citation omitted). There is no reason to reduce the number of hours requested for attorney Michael Custer. Following the standard set out above, there is no evidence that attorneys Eugene Black and Michael Custer billed for redundant work. Although the attorneys did not specifically set out in each billing segment what precise issue each researched at a particular time or what precise part of the brief each worked on, it can be inferred from the affidavits of Eugene Black, Howard Stiller and the case as a whole that no one person could have possibly handled this case. It is nearly preposterous to expect one attorney to handle a case of this magnitude alone. It is even advisable in a case like this that a senior attorney seek the assistance of a younger, less-experienced and less expensive attorney to help research and draft the many briefs and memoranda required when pursuing a discrimination case. As the hours requested for Custer seem more than reasonable in light of the difficult issues presented by this case, none of her requested hours will be reduced.

A majority of the other fees requested will be awarded minus the following subtractions. The research time spent on Plaintiffs' opposition to the court of appeals reinstating Defendants' appeal will not be allowed. This was not a claim related to the heart of this case—reverse racial discrimination. Rather, this issue dealt merely with whether Defendants could have their appeal reinstated after having been dismissed for failure to prosecute. This motion by Plaintiffs was denied outright by the court of appeals and the appeal ensued. Accordingly, the half hour spent on that will not be allowed. The time listed (0.2 on 8/11/98) as "Review of 11th Cir. notice to district court relative to dismissal of City's appeal" will also be subtracted. The time listed as 2.5 hours on 8/15/98 for "Review of City's motion to reinstate their dismissed appeal; legal research re: opposition to reinstatement of City's appeal" will also be subtracted. Also, 3.5 hours for drafting and editing brief in opposition to reinstatement of appeal on 8/17/98; review of Defendants' reply brief to reinstate appeal at 1 hour on 8/30/98; review of order reinstating appeal at 0.1 hour on 10/30/98; and review of appellants' brief on reinstatement at 1.3 hours on 12/2/98.

As for the intern Gail Drake, there is also no evidence suggesting this Court should reduce any of the hours attributable to her. It has long been established that attorneys are permitted (and, again, even advised) to use the services of an intern as long as the intern is performing work the attorney would ordinarily be performing and not merely clerical work. In this case, Ms. Drake contributed significantly to the proceedings in this case as she was already admitted to the South Carolina bar and planning to sit for the Georgia bar in February 2001. Based on the affidavit by attorney Stiller regarding the hourly amount attributable to her and the above facts, the hours and amounts of fees requested for Ms. Drake will be awarded in full.

The total number of hours awarded in this case are as follows: (1) 92.5 (101.6—9.1) hours for attorney Eugene Black at $175.00 per hour totaling an award of at-

torneys fees for $16,187.50; (2) 24.5 hours for attorney Michael Custer at $100 per hours for a total of $2,450.00 in fees; and (3) 18.5 hours for intern Gail Drake at $75 per hour totaling $1,387.50. Total attorneys fees awarded equal $20,025.00.

## III. Costs

"With the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs." *ACLU of Georgia v. Barnes*, 168 F.3d at 438 (11th Cir.1999) (citation omitted).

The costs listed in Plaintiffs' requests are: (1) $16.74 for a Federal Express charge requesting and extension of time to supplement the motion for fees on appeal, (2) $41.45 for copying of briefs at Office Depot; (3) $65.44 for copying and binding briefs at Office Max [13]; (4) $29.10 for charges to express mail the Petition for Rehearing En Banc; (5) $14.56 for express mail charges for the Motion for Attorney Fees; and (6) $15.50 for the Open Records Request which reported the attorneys fees paid to Defendants' attorneys which the Plaintiffs in turn used for comparison in requesting their own fees. All of these costs are reasonable and compensable. Accordingly, the Court awards $182.79 in costs to Plaintiffs.

### Conclusion

The Court hereby awards attorney's fees at the rates listed above for a total of $20,025. In addition, the Court awards costs in the amount of $182.79, for a total award of $20,207.79. The Court also awards the damages as described more fully in the sections above plus the appropriate rates of interest for pre and post judgment interest as allowed in federal cases pursuant to 28 U.S.C. § 1961. The damages awarded are:

1. Jody Shealy          $ 3,133.90;
2. Ted Barton           $ 3,003.95;
3. Ronald Rowe          $10,320.89;
4. Terry Cook           $18,717.19; and
5. Ricky Dudley         $15,636.73.

### APPENDIX I
### CALCULATION OF BELOW MARKET DISCOUNT RATE (BMDR)

| YEAR | CPI % CHANGE FOR YEAR | BOND RATE FOR 5 YEAR BONDS | DIFFERENCE REPRESENTING BMDR |
|------|------------------------|------------------------------|-------------------------------|
| 1994 | 2.7% | 6.69% | 3.99% |
| 1995 | 2.5% | 6.38% | 3.88% |
| 1996 | 3.3% | 6.18% | 2.88% |
| 1997 | 1.7% | 6.22% | 4.52% |
| 1998 | 1.6% | 5.15% | 3.55% |

13. Plaintiffs' attorney Eugene Black stated in his affidavit of February 16th, 2001 that these additional fees were incurred as the result of problems which arose at Office Depot. This problem necessitated taking the briefs to the second store, Office Max, to finish the copying and binding. Considering the unreliability of the technology of copy machines, this is perfectly reasonable and expected.

| | | | |
|---|---|---|---|
| 1999 | 2.7% | 5.55% | 2.84% |
| 2000 | 3.4% | 6.16% | 2.76% |
| AVERAGE RATE | | | 3.49% |

## APPENDIX II

### PRESENT VALUE CALCULATIONS FOR RONALD ROWE

| YEAR OF PAYMENT | YEAR OF PERIOD IN FUTURE | PRESENT VALUE AMOUNT |
|---|---|---|
| 1999 | 1 | 2,307.65 |
| 2000 | 2 | 2,307.65 |
| 2001 | 3 | 2,307.65 |
| 2002 | 4 | 2,011.76 |
| 2003 | 5 | 1,943.92 |
| 2004 | 6 | 1,878.36 |
| 2005 | 7 | 1,815.02 |
| 2006 | 8 | 1,753.81 |
| 2007 | 9 | 1,694.67 |
| 2008 | 10 | 1,637.52 |
| 2009 | 11 | 1,582.30 |
| 2010 | 12 | 1,528.94 |
| 2011 | 13 | 1,477.38 |
| 2012 | 14 | 1,427.55 |
| 2013 | 15 | 1,379.41 |
| 2014 | 16 | 1,332.89 |
| 2015 | 17 | 1,287.94 |
| 2016 | 18 | 1,244.51 |
| 2017 | 19 | 1,202.54 |
| 2018 | 20 | 1,161.99 |
| TOTAL DAMAGES | IN PRESENT VALUE | $33,013.46 |

## APPENDIX III
### PRESENT VALUE CALCULATIONS FOR TERRY COOK

| YEAR OF PAYMENT | YEAR OF PERIOD IN FUTURE | PRESENT VALUE AMOUNT |
|---|---|---|
| 2001 | 1 | 2,821.45 |
| 2002 | 2 | 2,634.36 |
| 2003 | 3 | 2,545.52 |
| 2004 | 4 | 2,459.68 |
| 2005 | 5 | 2,376.73 |
| 2006 | 6 | 2,296.58 |
| 2007 | 7 | 2,219.13 |
| 2008 | 8 | 2,144.30 |
| 2009 | 9 | 2,071.99 |
| 2010 | 10 | 2,002.11 |
| 2011 | 11 | 1,934.60 |
| 2012 | 12 | 1,869.35 |
| 2013 | 13 | 1,806.31 |
| 2014 | 14 | 1,745.40 |
| 2015 | 15 | 1,686.54 |
| 2016 | 16 | 1,629.66 |
| 2017 | 17 | 1,574.71 |
| 2018 | 18 | 1,521.60 |
| 2019 | 19 | 1,470.29 |
| 2020 | 20 | 1,420.71 |
| 2021 | 21 | 1,372.80 |
| 2022 | 22 | 1,326.50 |
| 2023 | 23 | 1,281.77 |
| 2024 | 24 | 1,238.54 |
| 2025 | 25 | 1,196.78 |
| 2026 | 26 | 1,156.42 |
| 2027 | 27 | 1,117.42 |
| 2028 | 28 | 1,079.74 |
| 2029 | 29 | 1,043.32 |
| TOTAL DAMAGES | IN PRESENT VALUE | $51,044.31 |

## APPENDIX IV

### PRESENT VALUE CALCULATIONS FOR RICKY DUDLEY

| YEAR OF PAYMENT | YEAR OF PERIOD IN FUTURE | PRESENT VALUE AMOUNT |
|---|---|---|
| 2002 | 1 | 2,008.40 |
| 2003 | 2 | 1,940.67 |
| 2004 | 3 | 1,875.22 |
| 2005 | 4 | 1,811.98 |
| 2006 | 5 | 1,750.88 |
| 2007 | 6 | 1,691.83 |
| 2008 | 7 | 1,634.78 |
| 2009 | 8 | 1,579.65 |
| 2010 | 9 | 1,526.38 |
| 2011 | 10 | 1,474.91 |
| 2012 | 11 | 1,425.17 |
| 2013 | 12 | 1,377.11 |
| 2014 | 13 | 1,330.67 |
| 2015 | 14 | 1,285.79 |
| 2016 | 15 | 1,242.43 |
| 2017 | 16 | 1,200.53 |
| 2018 | 17 | 1,160.05 |
| 2019 | 18 | 1,120.93 |
| 2020 | 19 | 1,083.13 |
| 2021 | 20 | 1,046.60 |
| 2022 | 21 | 1,011.30 |
| 2023 | 22 | 977.20 |
| 2024 | 23 | 944.25 |
| 2025 | 24 | 912.40 |
| 2026 | 25 | 881.63 |
| 2027 | 26 | 851.90 |

| | | |
|------|------|----------|
| 2028 | 27 | 823.17 |
| 2029 | 28 | 795.41 |
| 2030 | 29 | 768.59 |
| 2031 | 30 | 742.67 |
| **TOTAL DAMAGES** | **IN PRESENT VALUE** | **$38,275.63** |